|The Commonwealth *against* WOELPER and others.

QUO WARRANTO.

*Philadelphia.*

Saturday,
January 4.

THIS was an information in the nature of a *quo warranto* against *George G. Woelper, George Honey, Frederick Frické, John N. Fisher,* and *Frederick Hœckley,* five of the defendants, for usurping the office of vestrymen of the corporation called, The Ministers, Vestrymen, and Church-wardens of the German Lutheran Congregation in and near the city of *Philadelphia,* in the state of *Pennsylvania:* and against *Henry Block, William Berg,* and *John Kohler,* the three other defendants, for usurping the office of church-wardens in the same congregation. The defendants pleaded, that they were duly elected in the several offices mentioned in the information, on the 6th *January,* 1816, and that they had used the said offices since; whereupon, issue was joined. The case was tried at *Nisi Prius,* before GIBSON J. and a verdict given for the Commonwealth.

On the trial
of a *quo warranto* in which
the issue is on
the legality of
the election,
evidence may
be given of
conversations
and transactions previous
to the election,
if they were
connected
with, and
might have an
influence on
it, though no
previous notice thereof
has been
given.
Books of a
corporation
are evidence
in disputes between members of the corporation, especially if produced on the call of the adverse party. But they are not evidence against strangers.

Where a charter required two-thirds to form a quorum, and it was stated on the minutes, that on due invitation the corporators met, and it was not usual to mention on the minutes the names or number of those present, this was *held* to amount to saying, that two-thirds assembled.

Where a congregation was incorporated, and a power given " to make rules, bye-laws, and ordinances, and to do every thing needful, for the good government and support of the congregation," *held,* that the corporation had power to make a bye-law vesting the appointment of inspectors of their elections in the president of the corporation.

So also, that they had a power to make a bye-law prohibiting tickets from being counted at an election, which had other things on besides the names.

Having an eagle engraved on such tickets is a violation of the bye-law.

Under the charter of the German Lutheran Congregation in and near the city of *Philadelphia,* aliens otherwise qualified are entitled to vote.

An inspector of an election may be voted for as a candidate. GIBSON J. diss.

3 SR 29
30 SC ²571

A motion was made for a new trial, and the following were assigned as reasons :

1. That upon the trial, the Commonwealth was permitted to give evidence of conversations between individuals and of transactions at meetings of the corporation, and of certain members of the congregation, and of certain voluntary societies, without any previous specification or notice that such evidence would be offered on the trial ; and, moreover, that such evidence was irrelevant to the issue in the cause.

2. That upon the trial, the Commonwealth was permitted to give in evidence a certain instrument purporting to be a bye-law of the said corporation, without previous proof that it had been duly enacted as a bye-law by a quorum of two-thirds of the corporation convened upon notice, according to the charter and confirmatory act of assembly.

3. That upon the trial, the Judge in his charge to the jury stated, that the inspectors of the corporation election on the 6th *January*, 1816, had illegally received and counted the votes of aliens ; that aliens were not entitled to vote at such elections, although they were communicating and contributing members of the congregation above the age of 18.

4. That on the trial, the Judge in his charge to the jury stated, that in consequence of the provisions of the said instrument purporting to be a bye-law of the said corporation, the inspectors had illegally received and counted certain tickets marked with an eagle; for, that such tickets ought not to have been counted, although the voters who voted them were members of the congregation, entitled in all other respects to vote, and have their votes counted at the said election.

5. That the Judge charged the jury, that the votes given in favour of *Frederick Hœckley*, one of the defendants, could not be admitted, nor the return of his election as one of the vestrymen received, inasmuch, as the said *Hœckley* was appointed and acted as one of the inspectors of· the said election.

*Dallas* and *Rawle*, for the defendants.

*J. R. Ingersoll* and *Binney*, for the Commonwealth.

TILGHMAN C. J.· This is an information in the nature of a *quo warranto* against the five first named defendants, for

usurping the office of vestrymen of the corporation called, "The Ministers, Vestrymen, and Church-wardens of the "German Lutheran Congregation in and near the city of "Philadelphia, in the state of *Pennsylvania;*" and against the three last named defendants for usurping the office of church-wardens. The defendants pleaded, that they were duly elected to their respective offices. The verdict was against them, and they have moved for a new trial.

1817.

The Commonwealth
*v.*
Woelper
and others.

1. The first reason assigned for a new trial is, that the Judge who tried the cause, permitted evidence to be given, on behalf of the Commonwealth, of conversations between individuals and of transactions at meetings of the corporation of the German Lutheran Congregation, and at meetings of certain members of the Congregation; and at meetings of certain voluntary societies, without any previous specification or notice that such evidence would be offered at the trial; and, moreover, that such evidence was irrelevant to the issue.

As to giving notice of the evidence, no authority has been produced to shew, that it was necessary. The rule is, that either party may give evidence pertinent to the issue. The question is then, whether the evidence was pertinent. The issue is on the legality of the election. Every thing, therefore, is evidence which tends to shew, that it was illegal. There was tumult and violence on the day of the election; and those previous meetings and conversations were connected, as was contended on behalf of the prosecution, with what took place at the election. The jury were charged to pay no regard to these previous transactions, unless in their opinion they were connected with the election. But unless they were permitted to hear them, they could not judge whether they were so connected or not. Some of these previous matters were of such a nature as might well have an influence on the election. For instance, threats of bloodshed, and confederacies of members, might have a powerful effect in deterring peaceable people from going to the election. Of this the jury were to judge; and I think it was properly submitted to them.

2. The second reason for a new trial is, that a certain bye-law of the corporation was permitted to be given in evidence, without previous proof that it had been duly enacted as a bye-law by a quorum of two-thirds of the corporation, convened upon due notice, according to charter.

1817.

The Commonwealth
v.
Woelper
and others.

The books of the corporation, containing minutes of their transactions, were produced by the defendants at the request of the Commonwealth. These books are evidence in disputes between members of the corporation; though not against strangers. The law is so laid down in *Phillips on Evidence*, 319, and I think correctly; and the case is the stronger when the books are produced on the call of the adverse party. Now it appears by these minutes, that " after due invitation, " the ministers, elders, and church-wardens of the German " Lutheran Congregation met." This amounts to saying, that two-thirds of them met; because the charter requires that two-thirds should be assembled for the transaction of ordinary business. The minute of this meeting is like that of all the others. Their custom has not been to mention the names of the members who attended, or their numbers. It is a bad practice; but there is nothing on the minutes of the meeting at which this bye-law was passed, which induces a suspicion that it was not regular. I am, therefore, of opinion, that the evidence was sufficient to prove a meeting of two-thirds of the members after due notice. But now that I am upon the subject of the bye-law, it will be proper to consider what it is, and whether its provisions are legal. For it has been contended on both sides, that particular parts of it are illegal, though it is not agreed what these parts are. The fact is, that each party finds something in the law, which makes in his favour, and something which is against him. The bye-law was passed the 21st *December*, 1805, and its object is to regulate the proceedings at elections. By the third article, the president of the corporation is authorised to appoint two inspectors of the election. The defendants say this is all right; but the prosecutors contend, that it is illegal; being an infringement of the rights of the congregation. By the ninth article it is provided, that " if, " besides the names, there are other things upon the tickets, " or if two or more tickets are found together, such tickets " shall not be read off, and are not to be counted." The counsel for the prosecution approve of the whole of this article; but the defendants say, that the rejection of the tickets on which any thing stands besides the names, is an arbitrary and unreasonable regulation, exceeding the power of the corporation.

The original charter of the corporation was granted by

the proprietaries of *Pennsylvania*, on the 25th *September*, 1765; and at the request of the congregation it was confirmed, with some alterations, by act of assembly of the 3d *March*, 1780. By the 8th section of the charter, and the 11th section of the act of assembly, the corporation was authorised, " to make rules, bye-laws, and ordinances, and to do every " thing needful for the good government and support of the " congregation." But the right of electing the vestrymen and church-wardens, belongs to the congregation. It is argued on the part of the Commonwealth, that the appointment of inspectors who are judges of the election, is an incident to the right of election, and therefore belongs to the congregation : and the corporation had no power to deprive them of it. If the taking from the congregation the choice of inspectors, be really an infringement of the right of election, the bye-law cannot be good. But I do not view it in the light of an infringement. It rather appears to be a wholesome regulation, tending to prevent disorder on the day of election. The choice of the vestrymen and church-wardens still remains entire in the congregation. The inspectors do no more than receive and count the votes. But it is said that the inspectors are *judges*, and may decide the election as they please, by the admission or rejection of votes. Their office is ministerial rather than judicial. The charter declares who may vote, and the inspectors are bound by it. To be sure they must in some cases exercise their judgment, when a question arises on the construction of the charter. But so must every ministerial officer, when a question arises on the extent of his powers. If an inspector refuses a vote, the injured person is not without remedy. The decision of the inspector may be examined before some competent tribunal. This is exemplified in the present prosecution ; the object of which is to annul the proceedings of the inspectors. The choice of inspectors by the congregation is very inconvenient. An election without a judge is apt to be disorderly. Now who is to be the judge at the election of inspectors ? It was to prevent this disorder that the appointment was vested in the president ; and inasmuch as the election is still decided solely by the votes of the congregation, I am of opinion, that the bye-law is not an invasion of their rights, but tends to their good government within the meaning of the charter. Let us now look at the other

VOL. III.—E.

1817.

The Commonwealth
v.
WOELPER
and others.

part of this bye-law, that which respects the tickets. The charter does not specify in what manner the congregation shall give their votes: but the 9th section of the act of assembly declares that all elections shall be held by *ballot*. The bye-law regulates the manner of balloting. We have it in evidence, that the elections were formerly disturbed by the foolish and sometimes indecent practices of voters. Trifling or ill natured remarks, meant for witticisms, were written on the tickets, and sometimes the names of women of the town. To put an end to this kind of folly, and perhaps to prevent other inconveniences, the provision in the bye-law was introduced. And surely no one can complain, that his right of voting is impaired, when he is directed to give his vote, and nothing but his vote. When nothing but the names appear on the tickets they are easily read and counted. This tends to the despatch of business, and is a good regulation, as the election is to be made in one day. I am therefore of opinion, that this part of the bye-law is good.

3. The third objection of the defendants is, that it was given in charge to the jury, that the inspectors acted illegally in receiving the votes of *aliens*. This is a point of importance, not only to this but many other congregations. The counsel on both sides have been aware of its magnitude, and to do them justice, they have argued it extremely well. The charter is prefaced by a recital, " that divers members of " the German Lutheran Congregation, his Britannic Ma- " jesty's *liege and naturalised subjects*, residing in and near " the city of *Philadelphia*, had at a great expense, purchased " four lots of ground, and erected thereon a large church " called *St. Michael's Church*, with a school-house and par- " sonage-house, and had set apart the remainder of the said " lots for a burial place and other public uses of the said " congregation." In the first place, a dispute arises on the meaning of the words *liege and naturalised subjects*. Are we to understand by the word liege, only native subjects ; or does it include all persons residing in the country who are bound by their residence to a temporary allegiance ? Perhaps a person who owes but a temporary allegiance might, without impropriety, be called *a liege subject*. And it is certain that in an indictment of such a person for treason, it would be said that he had committed the treason *contra ligeantiæ suæ debitum*. Among lawyers, however, by the term

*Marginal note:*

1817.

The Commonwealth
*v.*
WOELPER
and others.

*liege* subject, is generally understood *a natural born subject*, as appears by *Co. Lit.* 129, *a.* and the marginal note in 2 *Inst.* 742. And this is the sense in which I take it to be used in the charter. For it is most probable that those persons who had purchased the ground and received a conveyance of it, were either natural born or naturalised subjects, capable of holding without dispute a legal estate in land. The next question is, to whom do these words " liege and naturalised " subjects" refer; to the *whole congregation*, or the *divers members* who had purchased the lots? I take it they refer to *those members*, and not to the congregation. This is the most natural construction : because it is certain that the subsequent parts of the same sentence, viz. " have at a great ex-' " pense purchased four lots of ground," &c. refer, not to the congregation, but the divers members. In the second section of the charter is a long recital, in which mention is made of certain fundamental articles established by the congregation, " tending to the orderly and good government of " the said church, the advancement of true piety, and the " forming good christians faithful subjects to his sacred " majesty, &c." I see nothing material in this recital ; for whether a member of the congregation was a natural born or naturalised subject, or an alien who intended to be naturalised, these articles might " *tend to make him a faithful subject.*" The third section creates the corporation ; and the eleventh, which is the most material, fixes the number of which the corporation shall consist, viz. the rector, twelve vestrymen, and six church-wardens, " who shall be chosen " *by the contributing members, being communicants of the* " *said congregation.*" The act of assembly confirming the charter makes no alteration in the qualification of voters ; except that no person shall be entitled to vote, who is not of the age of 18 years. Thus we see that the corporation and congregation are different. The corporation hold the estate for the use of the congregation: and the congregation elect the members of the corporation. In the qualification of voters there is no mention of *natural born* or *naturalised subjects*, as there is in the recital, in the first section of the charter. Whence this difference of language but from difference of intent? The charter is well drawn; the hand of a lawyer appears throughout. If it was intended to exclude aliens from voting, it is not to be conceived that the proper ex-

1817.

The Commonwealth
*v.*
WOELPER
and others.

1817.

The Commonwealth
v.
WOELPER
and others.

pressions should have been omitted. Nor need we be at a loss to conjecture why aliens were not excluded. At that time it required seven years residence to obtain naturalisation ; and it is highly probable that there were many aliens in the congregation at the date of the charter. Besides, what reasons could there be for excluding Germans of good character for so long a period from the small privilege of voting for those persons who were to be the guardians and trustees of the church? It was to be supposed that the Germans in general would go to church and take the sacrament, and most of them would contribute something to its support. What danger would there be in the enjoyment of this privilege? Would a policy so jealous as led to their exclusion, be consistent with the well known predilection of the family of *Penn* to German emigrants? It is said indeed that it would be dangerous to the interests of the old members of the church, if they were left at the mercy of a flood of newly imported people. But surely the congregation may regulate the admission of members. A stranger has not a right to intrude into a congregation against their will by tendering himself ready to take the sacrament and pay his contribution. These, however, are matters by the bye. I advert to them because they have been relied, on in the argument. But the point turns on the charter : there the qualification is fixed ; and as there is no mention of citizen or subject, either in the charter itself, or in the fundamental articles to which it refers, I do not conceive that we have any right to insert it. Considering it then as the intent of the charter, that aliens should be entitled to vote, it is not necessary to follow the learned counsel through the wide field of argument on the rights of aliens, and their disabilities with respect to holding land. The king may license an alien to hold land, because it is the king, and no other person, who has a right to the land purchased of an alien. The proprietaries of *Pennsylvania* were the only persons who had a right to land purchased by an alien, (supposing for argument's sake that an alien could not hold land at the date of this charter;) why then might not the proprietaries license an alien to hold land? It is true, indeed, that the king, as political head, might be interested in this matter in the then province of *Pennsylvania;* therefore I give no opinion on it. The case does not need it; because the charter has been con-

firmed by the legislature, who had all the power of the king. I think, therefore, that the inspectors were right in taking the votes of aliens qualified according to the charter.

4. The next exception is to the Judge's opinion in the case of *Frederick Hæckley,* one of the inspectors; that is to say, that he could not be voted for because he was a judge of the election. I have given my sentiments before as to his judicial character. I view him rather as a ministerial officer. Besides, it would indeed break in upon the rights of the congregation, if the president of the corporation could say *for whom they should not vote.* I think this matter has been decided by long practice; for I understand it to have been a very common thing to vote for inspectors in corporate elections and in state elections. I see nothing objectionable, therefore, in the votes which were given for *F. Hæckley.*

5. The fifth and last point turns on the construction of the bye-law before mentioned. The tickets in favour of those persons who succeeded in the election had on them the engraving of an eagle. The Judge who tried the cause charged the jury that those tickets ought not to have been counted. The case is certainly within the words of the law. The tickets had something more than *names* on them. But is it within the meaning of the law? I think it is. This engraving might have several ill effects. In the first place, it might be perceived by the inspectors even when the ticket was folded. This knowledge might possibly influence him in receiving or rejecting the vote. But, in the next place, it deprived those persons who did not vote the German tickets, of that secrecy which the election by ballot was intended to secure to them. A man who gave in a ticket *without an eagle* was set down as an anti-German, and exposed to the animosity of that party. Another objection is, that these symbols of party increase that heat which it is desirable to assuage. We see that at this election some persons wore eagles in their *hats.* The case then falling within the words of the law, and practices of this kind leading to inconveniences, I think the Court ought not to exercise their ingenuity in support of these tickets. This congregation has been long enough distracted by unfortunate feuds. Let us at least prevent future altercations at elections, by laying down such plain rules for the conduct of inspectors as cannot be mistaken. I am for construing the bye-law as it is written, and rejecting all

1817.

The Commonwealth
v.
WOELPER
and others.

The Commonwealth
*v.*
WOELPER
and others.

tickets that have any thing on them more than the names. This objection strikes at the root of the election; for the evidence is, that all the tickets in favour of the defendants were stamped with the eagle. Whatever may be the law, therefore, on other points, it is clear, upon the whole, that the defendants were not duly elected. It is so found by the verdict; and therefore there ought not to be a new trial.

YEATES, J. The acts and declarations of individuals who have been called the German party during the argument, opposed to the partial introduction of the English language in the public worship of the Lutheran Churches, were proper evidence in this cause, under the limitations laid down by the Judge, that they had reference to and could fairly be connected with the election. Whether this inference could fairly and reasonably be deduced from the mass of evidence proposed to be given, was a fit subject of inquiry for the jury, taking the whole into view, and rendering to every witness his due degree of credit. If the minds of the jurors should not be fully satisfied of this reference and connection, they were explicitly instructed, that those acts and declarations should have no influence on their verdict.

I know of no necessity the relators were subjected to as to furnishing a minute detail of what they meant to bring forward, in order to invalidate the election. The burthen of proof lay on the defendants to shew, that they were duly elected to their several offices. If they were entitled to a specification of the grounds on which the election was intended to be impeached, application should have been made to the Court to obtain it.

To disprove the usurpation of office, it was incumbent on the defendants to shew, that legal inspectors superintended the election. Formerly these inspectors were chosen by the congregation; but since the bye-law of 21st *December*, 1805, they have been appointed by the president of the corporation under it. If this ordinance is declared to be invalid, either on the ground of the want of proof of its having been enacted by a quorum of two-thirds of the corporation, convened upon due notice, or of its violation of the elective franchise, it necessarily follows, that the last election was bad on account of the illegal appointment of the inspectors. It will not suffice to say, that both sides acquiesced in the inspectors, and deli-

vered to them their tickets. The inspectors officiated under
the president's appointment, by virtue of the bye-law; and
if it was radically bad, the appointment was unauthorised.
Besides, the exercise of this power was the subject of com-
plaint in the congregation, and led in no inconsiderable de-
gree to the disorders on the day of election. If the bye-law
has no legal effect, I do not hesitate to say, that the defend-
ant's motion must be denied, inasmuch, as full justice in that
case has been done by the verdict, according to *Wakely* v.
*Hart, et al.* 6 *Binn.* 320. If, however, the opinion of the
learned Judge be correct, that the bye-law was valid, and the
appointment good, it was properly received in evidence, and
the objections to the charge must be considered.

The question whether aliens are entitled to vote at the
election of vestrymen and church-wardens in this corpora-
tion is highly interesting to the congregation, but is attend-
ed with peculiar difficulties. Analogous cases are rarely to
be found in the *English* books, and those cases are not equal-
ly authoritative with other parts of the law, where the local
circumstances of both countries precisely agree. Papal su-
premacy was prostrated, and monasteries were dissolved
many years before Mr. *Penn* obtained the royal charter of
*Charles* II. We know, however, that it has been adjudged,
that an alien may be an administrator, and that he shall have
administration of *leases* as well as personal things, because
he hath them in another's right, and not to his own use. 1
*Bac. Ab. Aliens*, D. 138, who cites *Cro. Car.* 8. *Vent.* 417.
And it is laid down in *Co. Lit.* 129, *a.* that an abbot, prior,
or prioress alien shall have an action, real, personal, or mix-
ed for any thing concerning the possession or goods of their
monastery; because they sue in their corporate capacity, and
not in their own right *to carry the effects out of the kingdom*.
This is said to be the doctrine of the common law *founded
on the usurpations of the pope*, and that an alien was capable
of holding a benefice. *Jenk. Cent.* 130. *pl.* 60.

The relators contend, that aliens are not entitled to vote
under the words of the proprietary charter of 1765, which re-
cites, " that divers members of the German Lutheran Con-
" gregation, his majesty's *liege* and *natural subjects*, had at a
" great expense purchased four lots of ground in *Philadelphia*,
" and had erected thereon a school-house, parsonage, church,
" &c., and that they had signed fundamental articles, tending

*1817.*

The Com-
monwealth
*v.*
WOELPER
and others.

"to the formation of *faithful subjects* of the king, &c."
Hence it is said, that *subjects* alone are comprehended in the
grant. But it is observable, that the words of the grant in
the charter are not restricted to *liege* and *naturalised sub-
jects;* and the rule is settled, that the preamble shall not con-
troul the general enacting terms of a statute, as in the fa-
mous instance of the Coventry act. It also deserves notice,
that the confirmatory act of 1780, is wholly silent as to citi-
zenship; and that the 9th section thereof refers to the funda-
mental articles, and not to the original charter as to the qua-
lifications of electors. We have not those articles, but as far
as we can collect from the corrected and enlarged copy of
them published in 1791, they are equally silent as to citizen-
ship. Upon the head of intention as disclosed in the two
charters, I think there is no restriction on the suffrages of
aliens.

How then does the case stand on principle, independently
of authority?

I do not hold that the late proprietaries or their deputy
governor, could by their own act confer on foreigners the
rights and privileges of natural born subjects. This can be
done only under the sanction of legislative authority. But
I can perceive no sound objection against aliens being in-
cluded in grants with others entitled to those rights and pri-
vileges, merely for religious purposes. The distinction be-
tween incorporations for political and religious ends is suffi-
ciently obvious. Foreigners come to our shores ignorant of
our laws and customs, with all their different prepossessions
for a particular system of polity. Should they think it ex-
pedient, they may distract, perplex, and thwart the public
measures of the country. The sovereign power would na-
turally guard against such events, and prevent these new-
comers from participating in all the rights of natural born
subjects, until they became seasoned to the soil, and familia-
rised with the new government and its legal institutions.
The same dangers are not to be apprehended from foreign-
ers desirous of being incorporated with others, merely for
the exercise of religious duties. They are members of the same
persuasion, and have imbibed the same tenets of doctrinal
faith from early infancy. This union is of a spiritual
nature, which they consider to be enjoined on them by the
Christian religion. The temporalities of the church may be so

fully secured, and their appropriation so distinctly marked out (as in the present instance), that they may be wholly disabled, in the language of the authority cited, *from carrying any of the effects of the church into a foreign land.* Such union, founded on a sense of religious obligation, *tends to the formation of useful citizens,* and useful members of society. If inconveniences are apprehended from a sudden influx of new comers, they may be guarded against by wholesome ordinances of the corporation, by confining the congregation to reasonable limits, suitable to their peculiar circumstances. But even if these supposed mischiefs cannot be fully prevented, I content myself with remarking, that they result from the nature of the incorporation, which we cannot alter or abridge. On this point, therefore, I am of opinion, that aliens were entitled to vote.

I am also of opinion, that if *Frederick Hœckley* had been legally appointed an inspector, he might with propriety have returned himself to have been elected a vestryman of the corporation. The legal principle that the same person cannot be judge and party, must give way *graviori legi*—to the rights of electors to select those persons they shall judge proper. The acceptance of the office of judge of the election, cannot impair the freedom of choice in his fellow citizens. The votes must all be counted, and the result of the election can only be returned by the proper officers. This is every day's practice at our general elections; and is most strikingly exemplified by what took place at the last election of common council men for this city, which was cited on the argument by the defendants' counsel.

But there is an insurmountable objection to the defendants' election; I mean the impression of the eagle in all the written tickets of the German party. My course of reasoning for some time, has proceeded on a supposition of the validity of the bye-law of the 21st *December*, 1805, without which the defendants could not support their claims. It is declared by the 9th section thereof, " that if, besides the " names, there are other things on the ticket, or if two or more " votes are found together, such tickets shall not be read off, " nor the votes counted." The figure of the eagle with the " motto *E pluribus unum*," is certainly within the words, and I think within the spirit of the ordinance. It was according to the correct expressions of the judge in his charge,

" a badge of party which tended to sow discord and to de-
" stroy all harmony and Christian charity." Such a symbol
of disunion, as I term it, was unbecoming in a grave assem-
bly, convened for the purpose of electing proper persons to
subserve and superintend the important interests of the
church, and conduced to widen the breach, which, unhappily
and to our great regret, exists among brethren professing the
same religious opinions. If the 531 tickets given in by the
German party are not counted, the inevitable consequence is,
that the defendants were not duly elected to their respective
offices, and therefore a new trial must be denied to them.

GIBSON J. At the trial, I felt great difficulty on the
question involving the right of aliens to vote, under the char-
ter and fundamental articles of the corporation. That diffi-
culty has not been removed by the argument that has since
taken place. Although I cannot say I have changed the
opinion I expressed to the jury, yet as it is of great im-
portance to the peace of the congregation, that the principle
now decided should be permanently established, I will not
withhold my mite of authority, but wish to be understood as
concurring, in this particular, with my brethren.

An objection was made to evidence of acts done by
the defendants in concert with others, before the day of the
election, tending to shew an organised plan to succeed by
violence. The objection rested on the ground that no spe-
cification or notice of the facts offered had been given ;
the affidavits on which the information was granted, com-
prising only transactions said to have occurred during that
day. If a specification be at all necessary to a proceeding
of this kind, it certainly will be sufficient, if it embrace those
facts that are the substantive ground of the charge ; but it is
not necessary, that matter which does not constitute a dis-
tinct ground of accusation, but is only preliminary and ex-
planatory of the motives of the actors, and the nature of the
acts charged, should be at all comprised. An indictment
for murder, simply charges the fact of killing with malice
afore-thought, yet various previous circumstances, such as
an old grudge, or declarations of ill will, are constantly given
in evidence. I take the distinction to be between facts that
are constituent parts of the offence, and the evidence by
which those facts are to be made out. I say nothing of the

1817.

The Commonwealth
v.
WOELPER
and others.

state of the pleadings, by which it appears the evidence was in its nature rebutting.

The defendants also objected to the admission of a bye-law, because, as it was said, the proper quorum required by the charter to give it validity, did not appear to have been convened when it was enacted. The protocol, or book of minutes, adduced by the Commonwealth, went far to remove this objection, in point of fact. But had it been otherwise, the objection ought not to have prevailed. The book of bye-laws was produced by the defendants themselves, on notice given; and although that alone would not, as against a stranger, supersede the necessity of the usual proof of authenticity, it is clearly otherwise with a party to the paper produced, or a person claiming under it. In a suit against a corporation, its bye-laws, produced as this was, may doubtless be given in evidence against it without further proof; so in a suit between corporators respecting their corporate rights; then why not in a suit between the Commonwealth and corporators to try the rights of the latter to their several offices?—especially when they must succeed, if at all, in establishing their rights, by virtue of its provisions.

There is another point on which I regret I cannot concur with the rest of the Court. I consider the judge of an election as a judicial and not as a ministerial officer. It is his business to decide on the qualifications of every one that presents himself as a voter; and though the law defines those qualifications, he is still to determine whether the party has brought himself within its provisions. The Judge of a Court of Record, does no more than apply existing rules to the facts in the cause: he has no arbitrary discretion; for the law is certain, or supposed to be so. The judge of an election, who is at the same time a candidate, has a direct interest in the event, and cannot be viewed in any other light than as judging in his own cause. It is no answer that his decisions may be examined by superior authority; so may those of any inferior tribunal, but the prohibitory principle is equally applicable to a Judge of the Supreme Court and a justice of the peace. I cannot discern the force of the argument drawn from the consideration, that there is no such character as that of a candidate known to our laws; a person actually a candidate, is guided by the same motives as if the law recognised him as such. Nor do I see how the rights of the

1817.

The Commonwealth
v.
WOELPER
and others.

electors would be infringed by declaring him ineligible ; they may still vote for him if they please, although he may be incapable of holding the office if elected. A person against whom there is no objection on the score of eligibility may refuse to serve ; and to do a voluntary act which incapacitates, amounts to the same thing. The Senate may create a disability in a person convicted on articles of impeachment, but that was never thought a direct curtailment of the elective franchise ; at least, as far as the electors are concerned. In matters of this sort usage ought to have no weight; for no usage, however general, can sanction a principle so pernicious in its tendency. But I apprehend the practice mentioned by the counsel has obtained no-where but in this city ; in the country, it would be viewed as an outrage on the rights of the electors. As to the other points, I adhere to the opinion I expressed to the jury.

Motion for a new trial refused.