### The COMMONWEALTH *against* M'CLOSKEY and others.

|  |  |
|---|---|
| 2r 369 |
| 199   543 |
| 2 R   369 |
| 32 SC   307 |
| 2r   369 |
| 39SC 3462 |

Under the act of assembly of the 24th of *March*, 1812, incorporating th township of *Moyamensing*, the three commissioners elect, are not competent to take part in deciding on the validity of their own election.

It is illegal, under the provisions of that act, for the commissioners elect to be sworn in before their election has been returned and approved.

Though the act of incorporation constitutes the commissioners whose term had not expired, judges of the election, and gives them full power and authority to approve thereof, or to set aside the same, and order a new election, as the law may require, yet, the superintending jurisdiction of the Supreme Court is not thereby ousted; but they may inquire into the legality of the proceedings of ·the commissioners in setting aside an election, by granting an information in the nature of a writ of *Quo Warranto.*

The commissioners have no right to set aside an election as to those persons who had a clear majority after deducting illegal votes.

THIS was a rule to show cause why an information in the nature of a writ *Quo Warranto*, should not be filed against the defendants, *James M'Closkey, John Paisley*, and *David Farrell*, to inquire by what authority they exercised the office of commissioners of the township of *Moyamensing*, in the county of *Philadelphia.*

The facts upon which the argument was had, were briefly these:—

The legislature, by an act of assembly, passed the 24th of *March*, 1812, incorporated the inhabitants of the said township by the name and style of " The commissioners and inhabitants of the township of *Moyamensing*."   Nine persons are required to be elected, who

(The Commonwealth *v.* M'Closkey and others.)

shall constitute the Board of Commissioners, and on the third Friday in *March,* in each and every year, the citizens qualified to vote for members of the general assembly, are authorised to elect three commissioners, to serve three years respectively. The third section of the act of incorporation provides, that "the three persons who shall at every subsequent election have the highest number of votes, for the said office of commissioners, together with the six commissioners, whose time shall not have expired, shall meet at such place as shall be legally appointed, between the hours of two and four in the afternoon on the first Monday of *April* next following each and every election, to be held in pursuance of this act, and shall then and there receive the said return of commissioners elect, and shall forthwith proceed to examine the same, and to judge and determine thereon; and for that purpose, the said commissioners, or a majority of them, shall be judges of the said election, and shall have full power and authority to approve thereof, or to set aside the same, and to order new elections, as the case may require, to be held in the manner herein before directed, and at such times as shall be by them appointed, of which they shall give at least six days previous notice, by hand-bills posted up in at least ten of the most public places in the said township."

The *fifth* section provides, that "every commissioner who shall be elected and returned, and whose election shall be approved in manner aforesaid, shall, before he enters on the exercise of his said office, be sworn or affirmed before some justice of the peace of the county, well and faithfully to execute the office of commissioner of the said township; and shall, thereupon, without any further, or other commission, enter upon the duties thereof, and shall hold and exercise the same for the term for which he shall have been elected as aforesaid."

On the 20th of *March,* 1829, an election was held in the said township, for three commissioners, to serve for three years. The judges of the election made return, that the three defendants above named, had the highest and greatest number of votes, and were duly elected. It appeared, that *Paisley* had two hundred and seventeen votes, *M'Closkey* one hundred and fifty-three votes, and *Farrell* one hundred and fifty votes. It was likewise given in evidence, that three other persons were voted for at the said election, and that the highest of the three, viz. *James Ronaldson,* had one hundred and forty-seven votes.

On the first Monday in *April,* succeeding the said election, the Board of Commissioners were convened, agreeably to the provisions of the act of incorporation. *Five* of the six commissioners, whose time had not expired, were present, and *one* was absent. A memorial, signed by fifteen inhabitants of the said township, complaining of corruption and illegality in the said election, was presented to the Board. The memorial was accompanied by depositions, tend-

(The Commonwealth *v.* M'Closkey and others.)

ing to prove, that three illegal votes had been taken; and an offer was made to prove other illegal votes.

It appeared, that the three commissioners elect, had been sworn into office, previously to the meeting of the Board, on the first Monday in *April,* 1830. When the Board met, the three commissioners elect insisted on voting to approve of their own election. Two of the remaining five commissioners asserted the right of the three commissioners elect to vote, and the other three protested against it. The Board divided, and formed two separate boards. The three commissioners elect, and two of the remaining commissioners, constituted themselves a board, and organised themselves by the election of officers. The other three remaining commissioners, together with the one who was at first absent, but afterwards attended, and acted with the last named three remaining commissioners, organised themselves into another Board.

The Board, composed partly of the commissioners elect, refused to permit the memorial, and the documents accompanying it, to be read. The other Board, consisting of the four old commissioners, received them, and notified the defendants to appear on the 15th of *April,* inst., when they would proceed to examine into and determine the validity of the said election. The commissioners elect did not appear, as directed, and the Board proceeded to hear the petitioners and their proofs, and declared the election void, and ordered a new election to be held on the 23d day of *April* following. An election was accordingly held, at which *James Ronaldson* received one hundred and sixty-one votes, and *Robert Thornton* and *Samuel Parker* received one hundred and sixty-one votes each, and were declared duly elected, the opposite party not participating in the last mentioned election. The four old commissioners, abovementioned, received the return of the last election, and admitted the persons elected as members of the Board.

The question to be decided by the court was, the right of the defendants to act as commissioners.

The case was argued by *J. Randall* and *P. A. Browne,* for the relators, and by *Dallas* and *Binney,* for the defendants.    A general examination of the different acts of assembly, incorporating cities, boroughs, towns, and districts, throughout the state, was gone into, in the course of the argument.

The opinion of the court was delivered by

Rogers, J.—On the 20th of *March,* 1829, the respondents were elected to serve for three years, as commissioners of the township of *Moyamensing.* It appearing, at the close of the polls, that they had the highest number of votes, and the judges having given them notice of their election, on the 2d of *April,* 1829, they took the oath of office. The judges, in pursuance of the second section of the act of incorporation, returned the respondents as duly elected. Before the meeting of the commissioners, which is directed to be on

(The Commonwealth *v.* M'Closkey and others.)

the first Monday in *April*, a memorial, respectful in its terms, was prepared and signed by a number of the legal voters of the township, alleging, that sundry abuses were practised, and many votes taken of persons who were not citizens qualified to vote for members of the general assembly, and praying, that the abuses may be inquired into, according to law; and they annex to the memorial, evidence of the illegality of three votes. At the time appointed for the meeting of the commissioners, viz. the third Monday of *April*, present *Edward Smith, Jacob Thomas, Robert M'Affee, Samuel Bell, George Kirkpatrick*, commissioners, and the defendants, *John Paisley, David Farrell,* and *James M'Closkey*, commissioners elect. *Edward Smith* stated, he wished to lay before the Board, a remonstrance, contesting the election. The remonstrance was not suffered to be read, nor was any vote taken on it, but it was ordered to lie on the table, by *George Kirkpatrick*, who had been elected president *pro tem.* The returns of the election were then read, whereon it appeared, that *John Paisley* had two hundred and seventeen votes, *James M'Closkey* had one hundred and fifty-five votes, and *David Farrell* had one hundred and fifty votes. There is, then, this entry on the minutes, "adopted by the majority of the Board;" which, although informal, amounts in substance, to an approval of the election of the respondents. *Edward Smith, Jacob Thomas,* and *Robert M'Affee*, were opposed to the approval. The oath of office of the commissioners elect, was then read, together with a notice of their election. The Board, viz. the commissioners elect, and two of the commissioners of the old Board, went into an election for president, and other officers; *Jacob Thomas, Edward Smith,* and *Robert M'Affee,* refusing to take any part in the proceedings. The 10th of *April*, 1829, at a special meeting of the commissioners, present *Edward Smith, Jacob Thomas, Thomas Query,* and *Robert M'Affee;* Mr. *Query* presented the memorial of sundry inhabitants, complaining of certain abuses practised at the election, held on the 20th of *March*, which being read, on motion, it was resolved, that on the 13th inst., they would inquire into the abuses complained of in the memorial; and, on the 13th inst., (having previously given notice to the respondents, who did not attend,) they did inquire, set aside the election, and ordered a new election to be held on the 23d of *April*, inst., which resulted in the choice of *James Ronaldson, Robert Thornton,* and *Samuel Parker*, whose election was approved by the four commissioners above stated.

This is an application in the case of a public corporation, for a rule to show cause, by what authority the respondents claim to exercise the duties of commissioners of the township of *Moyamensing*.

The question arises on the third and fifth sections of the act of assembly of the 24th of *March*, 1812, entitled, "An act to incorporate the township of *Moyamensing*, in the county of *Philadelphia*."

From the facts which have been disclosed, it is apparent, that the

(The Commonwealth *v.* M'Closkey and others.)

approval of the election of the respondents, depends altogether on their own vote, and that independent of that vote, there had not been that confirmation of the election, which is required by the act of incorporation. The inquiry will then be, to which all others are subordinate, in some measure, whether the act of assembly authorises this proceeding on the part of the commissioners elect; whether each of them who have been returned elected, are entitled to judge of their own election, with full power and authority to approve thereof.

It will be conceded, that where it can be avoided, no man should be permitted to decide his own cause; nor can I perceive much difference, where he is called on to determine his right to an office of profit, or one of trust, accompanied as this is, with extensive patronage. The temptation to an abuse of the trust is as great in the one case as the other; and is such, that no prudent legislature would entrust such a power to any person, unless in cases of necessity; and where such necessity exists, the legislative grant would, we should be led to suppose, be in such clear, unequivocal terms, as to leave room for neither doubt nor cavil. In *England,* it is said, that even an act of parliament, made against *natural equity,* as to make a judge in his own cause, is void in itself; for as it is expressed, *jura naturæ, sunt immutabilita;* and they are *leges legum. Davy* v. *Savage, Hob.* 87. And in 12 *Mod.,* if an act of parliament should ordain, that the same person should be party and judge, or which is the same thing, judge in his own cause, it would be a void act of parliament, for it is impossible, says the court, that one should be judge and party; for the judge is to determine between party and party, or between the government and a party; and our own courts appear equally averse to the introduction of such a principle.

An act of the legislature, says Justice Chase in *Calder and Wife* v. *Bull. 3 Dall.* 386, contrary to the great first principle of the social compact, cannot be considered a rightful exercise of legislative authority. The obligation of a law in governments established on express compact, and on republican principles, must be determined by the nature of the power on which it is founded. A law that punished a citizen for an *innocent* action, or in other words, for an act, which when done, was in violation of no existing law; a law that destroys or impairs the lawful private contracts of citizens; a *law that makes a man a judge in his own cause,* or a law that takes property from A. and gives it to B., it is against all reason and justice, for a people to entrust a legislature with *such powers;* and therefore, it cannot be presumed, they have done it. The genius, the nature, and the spirit of our state governments, amount to a prohibition of such acts of legislation; and the general principles of law and reason failed there. To maintain, that our federal or state legislatures possessed such powers, if they had not been expressly restrained, would be a political heresy, altogether inadmissible in a republican government. To these high and imposing authorities,

(The Commonwealth *v.* M'Closkey and others.)

I may add the opinion of the present Chief Justice, in *The Commonwealth* v. *Woelper et al.,* 3 *Serg. & Rawle,* 43, which it is a mistake to suppose was overruled or contradicted, by the other members of the court.

In this view, the right claimed by the respondents, struck the judicial mind in *England* and in this country, and particularly the powerful intellect of Justice Chase. Although I fully accede to the general principle of that distinguished jurist, yet, I should pause before I would carry it to the extent he seems willing to go. If the legislature should pass a law in plain, unequivocal, and explicit terms, within the general scope of their constitutional power, I know of no authority in this government to pronounce such an act void, merely because, in the opinion of the judicial tribunals, it was contrary to the principles of natural justice; for this would be vesting in the court a latitudinarian authority which might be abused, and would necessarily lead to collisions between the legislative and judicial departments, dangerous to the well being of society, or at least, not in harmony with the structure of our ideas of natural government. Justice is regulated by no certain or fixed standard, so that the ablest and purest minds might sometimes differ with respect to it. Besides, necessity dispenses with those general principles, and the legislature must be the judges when the necessity exists—when the exigencies of society require the investment of such extraordinary powers. It must undoubtedly rest in their wisdom, to determine when the public welfare, to which all else must be subservient, requires the assumption of such principles. Whilst I, then, in some measure, disclaim the doctrines of that eminent man, yet, the laws have a right to claim the benefit of another principle of construction. Unless the words of the act be plain and explicit, the court is bound, in decency, to conclude, that the legislature had no intention to violate the principles of equity, or without necessity, to contravene the first principles of the social compact: That, as it is against reason and justice, and the fruitful source of faction, corruption and abuse, that a party interested, should judge his own case; it is not to be presumed, but directly the contrary, that the legislature have invested the respondents with such extraordinary powers.

I have looked in vain into the third section, which has been mainly relied on by the respondents, for any express words, or necessary implication, authorising the commissioners elect, each in his own case, to examine and judge of the election. The legislature had in view the original organization of the corporation, and its continuance, by the election of three members each year, to supply vacancies occasioned by the rotatory principle provided by the act. Hence, an ambiguity has arisen in the phraseology of the act, from not accurately distinguishing the manner of proceeding at this period, which are so essentially different. From necessity, at their organization, they may be permitted to verify their own powers,

(The Commonwealth *v.* M'Closkey and others.)

and perhaps without the sanction of an oath; but even then, this may be done, without violating a principle of *American* as well as *English* jurisprudence, founded in rational equity, and laid down by eminent jurists, as an acknowledged principle of universal law. Each one must be permitted to vote in the case of his fellows, but not in his own. The election of one of the nine, might be well questioned, without interfering with the right of the others.

After the corporation has been called into being, no necessity can ever be pretended; as then there are persons acting under the sanction of an oath, competent to decide upon the conflicting claims in a contested election.

The third section provides, that the nine persons who shall at the next election, to be held in pursuance of this act, have the highest number of votes for the office of commissioners, shall meet together, &c. on the first Monday in *April* next following the election; and that the three persons who shall, at every subsequent election, have the highest number of votes for the said office of commissioners, together with the six commissioners, whose time shall not have expired, shall meet together, at such place as shall be legally appointed, &c. on the first Monday of *April* next following each and every election, to be held in pursuance of this act; and shall then and there receive the said returns of commissioners elect, and shall forthwith proceed to examine the same, and to judge and determine thereon; and for that purpose, the said commissioners so met, or a majority of them, shall be judges of the said election, and shall have full power and authority to approve thereof, or to set aside the same, and to order new elections, as the law may require, to be held in the manner herein before directed, and at such times as shall be by them appointed, &c.

The fixing a particular day for the meeting of the commissioners and the commissioners elect, is necessary, because, in case there should be no dispute, the members of the Board would be in attendance, and in readiness to enter upon the discharge of the duties of their office; and in this point of view, it was a prudent precaution. As the scrutiny into the qualification of voters is usually made at the polls, the examination of the returns, and the approval of the election is, in a great majority of cases, a matter of form. But where there is reason to believe, that the returned members have not been duly elected, it becomes a different affair. There another, and a more careful scrutiny takes place, before a tribunal on whom devolves a most important duty, to examine, judge, approve or set aside the election. The act says, "and for that purpose, the said commissioners, so met, or a majority of them, shall be judges of the said election;" that is to say, for the purpose of examining, and judging, the commissioners shall be the proper tribunal. What then do the legislature mean, by the terms, the "commissioners so met?" In my judgment, they intended to designate commissioners in the strict and legal sense of the word. Who, then, is a commis-

(The Commonwealth *v.* M'Closkey and others.

sioner? No person can be considered as such until he is duly qualified to perform all the duties of the office; and this can only be when he has been elected, returned, his election approved, and when he has duly taken the oath of office. The "commissioners so met," means the commissioners whose time has not expired, in exclusion of the commissioners elect; and in aid of this idea, it would seem, the legislature has discriminated, although not in very plain terms, between commissioners and commissioners elect. If the legislature intended otherwise, it would have been very easy to have expressed their meaning in such precise and definite terms, as to have avoided all difficulty. Not having done so, we feel ourselves at liberty, nay, bound in common decency, to suppose they did wish to be so understood. We are authorised to believe they did not intend to contravene a principle, which has been deemed by the most eminent jurists, contrary to natural equity, and the first principles of the social compact. On the contrary supposition, the approval of the election, would be a mockery, as we could not suppose, particularly with the knowledge of the facts which have been disclosed, that an interested party, under the influence of irritated and party feelings, could bring to the examination that impartiality which is necessary to a proper and correct decision. We exclude a juror or a witness when he is interested, and much more so ought we to guard from pollution the determination of the most sacred right, the republican principle, which has been engrafted into this state, that it is the majority of legal voters who shall confer the office.

If the question, then, depended entirely on the third section, I should say, the commissioners elect, had no right to vote, when their own election was in dispute. But this is rendered still more plain by the fifth section, which provides, "that each and every commissioner who shall be elected and returned, and whose election shall be approved in manner aforesaid, shall, before he enters on the execution of his said office, be sworn or affirmed before some justice of the peace of the county, well and faithfully to execute the office of commissioner of the said township; and shall, thereupon, without any further or other commission, enter upon the duties thereof, and shall hold and exercise the same for the term for which he shall have been elected as aforesaid."

The oath of office was administered to the respondents before the election was approved, and even before the return of the election, although after they had received notice from the judges. I do not perceive why the justice might not as well have sworn them in when they were put in nomination, on the ground of the certainty of their election, and the presumption, that the election would be approved. It would no more have been a violation of the letter, and, I believe, the spirit of the act, in the one case, than in the other. The section provides, that the commissioners shall be elected and returned, and approved, and then sworn. And this is the natural order of proceeding. First we have the election,

(The Commonwealth *v.* M'Closkey and others.)

then the judges return the highest in vote, after which, the legal tribunal approves or sets aside the election; and if the election be approved, then, and not until then, the person who has been elected, returned, and approved of, shall be sworn, well and faithfully to execute the office of commissioner of the township, and shall, thereupon, (that is to say, after his election shall have been confirmed,) without any further or other commission, enter upon the duties of his office.

But what are the duties of the office?   The first duty a commissioner has to perform on the meeting of the Board in every year, is to examine, to judge, and determine on the election of such members as may be returned by the judges, to supply the vacancies in the Board.

If then, I am right, in supposing, that the oath ought not to be administered to the commissioners elect, until their election be confirmed, it is a strong argument to show, that the legislature did not intend that they should take any part in the inquiry, when it ceases to be matter of form, and becomes matter of substance, by the presentation of a respectful memorial, complaining of an undue election.   Surely, it was not contemplated, that some should act with oath, and others without oath; and that those who had not been sworn, should be the persons, who were interested in the decision. When the respondents claim the privilege of voting, it is reasonable to object, that they cannot vote without having taken the oath, and that the oath cannot be lawfully administered until the approval of the election, by the tribunal legally constituted for that purpose.

The constitution of the *United States* prescribes, " That each house shall judge of the elections, returns, and qualifications of its own members."   The constitution of *Pennsylvania,* in nearly the same words, "That each house shall judge of the qualifications of its members."   The right of determination is given to the house, who exercise their authority by the decision of the majority, as in the act it is vested in the commissioners, or a majority.   Under these different provisions, no instance can be produced, either in congress or our state legislature, where such a right has ever been permitted, or even claimed.   The nearest they have ever gone to it in congress was, where returned members voted on a principle, on which their own election depended; a case entirely different from this, and the propriety of which, might be well questioned; at any rate, I feel but little respect for a decision which comes in such a questionable shape.

However this may be, we know this cannot occur in our state legislature, for by the act of the 29th of *September,* 1797, upon a petition, signed by twenty qualified electors, complaining of an undue election, being presented to the senate or house of representatives, they select a committee, appointed by lot, in the manner pointed out by the act, to determine the contested election, whose report, when entered on the journals, is final and conclusive; and so far

(The Commonwealth *v.* M'Closkey and others.)

from the person whose election is contested, being entitled to vote, the returned member, and the candidate next highest in vote, are made parties in the trial. We must, therefore, seek in vain for any analogy to the present proceeding, in the constitution of the *United States* and of this state, and the practice which has obtained, in congress and our state legislature.

In the warmly contested election for *Westminster*, in 1784, Mr. *Kenyon*, afterwards Lord KENYON, denied the right of Mr. *Fox*, who at the time was a member for a small borough in the *Orkneys*, of being present during the discussion, and asserted, that even hearing him was an indulgence. Against the principle of the assertion Mr. *Fox* directly protested, maintaining, that he had not only the right to speak, but a positive and clear right to vote. This claim he grounded on the fact, that he was a member of parliament, and he was advocating the right of the electors of *Westminster*, rather than his own pretensions.

To admit, whether this, as has been insinuated, is any authority in favour of the respondents, particularly, taken in connexion with the fact, that he neither voted, nor offered to vote.

The respondents have relied on several acts of assembly, wherein they state, similar powers have been conferred by the legislature. If the acts of assembly are the same as in the incorporations of the district of *Southwark* and the *Northern Liberties*, it proves nothing more than that our decision may affect more than the township of *Moyamensing;* and is, of course, as we are well aware, an important question. They, however, shed no light on the construction of the act, unless the counsel had, in addition, shown an adjudication in accordance with the rule for which they contend. If different, I cannot perceive they are entitled to the slightest weight. It will, however, be seen, by reference to those acts, that the legislature have not, even in terms, departed from the principles which I have advocated. That the provisions of the act may not be ineffectual, they have made them judges of their own election. The legislature by no means say, that a member of council shall, or may vote, when his own election is contested, but, that the common councilmen, or a majority of them, shall exercise that right; a principle, similar to that which has been introduced into the constitution of the *United States*, and this state. If the right of one, or two, or more, was disputed, it would be very clear to me, that the interested party could not interfere in the decision. And even, if the election of the whole of them was in contest, they might, and I think, ought, as in the case to which I have alluded, vote on the principle, without each one voting directly in his own case; and even this could be only justified on the plea of necessity, to prevent a failure of the act of incorporation. For a man to constitute himself a judge in his own cause, is indelicate and indecent. It is not necessary, to prevent a failure of the corporation, nor is it within the spirit or words of the act, which gives the decision to the coun-

(The Commonwealth *v.* M'Closkey and others.)

cilmen, or a majority of them, who are authorised to judge of the election of their own members. The legislature have been cautious, not to extend the power further than the necessity of the case may require, and within these limits they may be allowed to act; and unless the legislature expressly say otherwise, they shall not be permitted to go, with my consent, a step further.

But it is said, the power may be abused, and of this, if we could have had any doubt before, we have been abundantly satisfied by the facts which have been disclosed in this investigation. If, however, they have acted corruptly, they are amenable to the laws, and to the opinion of their fellow citizens, which, in most cases, may prove a sufficient restraint. It is also, equally within the limits of probability, that the judges of the election may be within the sphere of the same corrupt and factious influence, by which they may be induced to make an improper return; and if the returned members may be permitted to confirm their own election, it would lead to equal, if not greater mischief.

If, then, this matter rested here, I should have no difficulty in saying, that the rule should be made absolute. But, as has been already stated, at a special meeting of four of the commissioners, they undertook to set aside the election, and order a new election, which resulted in the choice of three other gentlemen, to supply the vacancy in the Board. At the first election, it appeared, that *John Paisley,* had two hundred and seventeen votes, *James M'Closkey,* one hundred and fifty-five votes, and *David Farrel,* one hundred and fifty votes, whereas the highest of the other candidates had but one hundred and forty-seven votes. Two questions, then arise: 1st, Have the commissioners power to decide, without examination or control, by the Supreme Court? and, 2d, If we have power to interfere, is this such a case, in which it is the duty of the court to interpose, in consequence of an improper exercise of authority by the commissioners?

The act says, that the commissioners, or a majority of them, shall be judges of the election, and shall have full power and authority to approve thereof, or to set aside the same, and to order new elections, as the law may require. From this, it has been inferred, that the court are ousted of their jurisdiction. By the act of the 22d of *May,* 1722, the Supreme Court have full power and authority to issue forth writs of *Habeas Corpus, Certiorari,* and writs of error, and all remedial and other writs and process; and, generally, they are empowered to minister justice to all persons, and to exercise the jurisdictions and powers, &c. as fully and amply, to all intents and purposes whatsoever, as the justices of the Courts of King's Bench, Common Pleas, and Exchequer, at *Westminster,* or any of them may or can do. This is a great, full, and plenary power to the court, wisely entrusted to them for the public welfare, and which we are bound to exercise, on the complaint of persons aggrieved. Under this law, the Supreme Court have been in the

(The Commonwealth *v.* M'Closkey and others.)

constant practice of granting informations in the nature of a writ of *Quo Warranto,* for exercising an office, in a private as well as a public corporation, not by force of the statute of 9 *Ann. ch.* 9, but by power derived from the common law. As the jurisdiction of the court has been expressly granted, it cannot be taken away, except by express words, or necessary implication, neither of which appears in this act.

When the legislature gives full power and authority to approve or set aside an election, I cannot believe that they intended that the supervising jurisdiction of the Supreme Court should be taken away. These words cannot have greater effect than the words, "final and conclusive between the parties," used in a great variety of acts of assembly; and, yet, it is a well settled principle, that these expressions do not take away the jurisdiction of the court. The legislature being aware, that this is a well-settled rule of construction, would, if they had intended to preclude inquiry, have prevented this court from exerting their superintending authority by express prohibition. This case furnishes a reason against the placing or putting public or private corporations above the reach of inquiry.

And this leads to the second question, whether there was a rightful exercise of authority in setting aside the election of the respondents. As respects Mr. *Paisley* and Mr. *M'Closkey,* there cannot be the slightest particle of doubt. Mr. *Paisley* had a majority of seventy, and Mr. *M'Closkey,* a majority of eight votes. How the commissioners could have supposed they were justified in setting aside their election, on the proof of two, or at the most, three illegal votes, passes my comprehension. I see no reason for supposing, that the judges of the election were corrupt, although they may have been mistaken. *Edward Smith,* one of the commissioners, says, that they inquired into the circumstances of the election, held on the third Friday of *March.* Witnesses were examined by the commissioners, on the subject of the election. It was proven, that persons had voted at that election, who were not entitled to a vote, persons who did not reside in the township, and persons who were not authorised to vote in the township. By the latter description, he says, he means aliens. In his cross-examination, he says, they made no inquiry as to whom they voted for. *Robert Parker,* an alien, voted. He was qualified in the presence of the commissioners, that he had voted, and that he was an alien. *John Woods* and *Daniel Daniels* voted. These were all it was proven against, that he recollects. Although it is clear, that the two first were duly elected, yet, there is some difficulty as respects *David Farrel;* and if they had merely set aside his election, we should not have been disposed to interfere. It would appear, that three illegal votes were taken at the election, which being deducted from the highest, which, I believe, is the legislative rule, there was an equality of votes. If this be the case, as regards him, there was no election. It is to be regretted, that we cannot set aside the election, as re-

(The Commonwealth *v.* M'Closkey and others.)

spects *David Farrel,* and order a new one, which might be the means of restoring harmony in the township.　As we have no such authority, the rule must be made absolute, as to *David Farrel,* and refused as to Messrs. *Paisley* and *M'Closkey.*

GIBSON, C. J.—This species of information was freely used by the crown in disfranchising most of the corporate towns of *England,* previous to the statute 9 *Ann.* 8, 20, which gave no new remedy, but enlarged an existing one, by authorising it, at the instance of an individual, and allowing costs to the relator or the respondent, according to the event.　The circumstance of that statute not being in force here, furnishes no argument against the information as an existing remedy.　It is, however, so far modified by usage, in analogy to the statute, as to be grantable at the relation of an individual; but in every other respect, it has been considered to be in force here, as at the common law.　It is declared in the constitution, (article nine, section tenth,) "That no person shall, for any indictable offence, be proceeded against CRIMINALLY by information," except in certain specified cases.　But every information is in form, a criminal proceeding; and the framers of the constitution were guilty of a pleonasm, unless they meant to assert, that there are cases in which it may be used substantially as a civil remedy.　Now, it so happens, that the best of the elementary authors has asserted the same thing.　As a method of criminal prosecution, the information in the nature of a *Quo Warranto,* has long fallen into disuse, the fine being merely nominal, and the effect of the judgment to oust an intruder; and thus restricted, it is now used to try title to a franchise.　3 *Comm.* 263.　In fact, it contains all that is valuable in the ancient writ of *Quo Warranto;* to which, with its uncouth forms and interminable pleadings, the necessity which there often is, of giving redress in some shape, would compel us to return.　Can it be doubted, then, that the convention, containing as it did, many of the ablest lawyers in the state, had particularly in view the preservation of this proceeding as a civil remedy?　Even were that doubtful, yet the point has been settled by cotemperaneous construction and long practice.　*The Commonwealth* v. *Wray,* 3 *Dall.* 490, in which it was expressly ruled, was within nine years from the adoption of the constitution; since when, it has been followed as a precedent, by different judges, through six successive cases, in which the principle was reasserted without the expression of a doubt, either on the bench or at the bar; which ought, one would think, to put the matter at rest.　After thirty years' practice, to question a train of authorities such as these, tends to shake all confidence in the stability of judicial decision, and leaves the law, itself, in a state of distressing uncertainty.

In regard to the remaining points, I regret that I am compelled to dissent from the opinion of the majority.　The objection, to what appears to me to be the obvious and natural construction of the

(The Commonwealth *v.* M'Closkey and others.)

third and fifth sections of the act of incorporation, is, that it would make the commissioners elect, judges in their proper cause. Such a result is forbidden by no clause in the constitution; but there are various *dicta* in the books, to the effect, that statutes which are against reason or natural justice, are void. Of late, however, the matter is treated more soberly, and it is now considered, that no statute, the meaning of which is clearly and unequivocally expressed, is void either in its direct or its collateral consequences; in so much, that its effect cannot be questioned, except on a reasonable presumption, arising from the generality of the words, that the actual meaning is different from the literal purport. 1 *Comm.* 91, *Note.* Such was the case of the legislative grant of power to try all causes within the manor of *Dale;* the words of which, might be reasonably satisfied without authorising the judge to try his own cause. Is there, then, an ambiguity arising from the generality of the words in the sections under consideration? The first Board of Commissioners were directed to judge of the validity of their own election, in set terms. For subsequent cases, it is provided, that the three commissioners elect, together with the six whose term shall not have expired, shall meet at a time and place to be designated, receive the return of the commissioners elect, examine the same, "and judge thereon; and for that purpose, the *said* commissioners *so met,* or a majority of them, SHALL BE JUDGES OF THE SAID ELECTION." Now, it seems to me, that grammatical analysis can neither assist nor obscure the meaning of this; nor does language afford words to express it more distinctly or positively. But it is provided in the fifth section, that "each commissioner, whose election has been approved in manner aforesaid, shall, before he enters on the execution of his said office, be sworn or affirmed," to execute it with fidelity; and, hence, an argument, that as he cannot perform its duties before his election has been approved, he cannot take part in determining the validity of it, which is as much an official business as any other; at least, that in the order prescribed, he would perform it before being sworn. It is plain, however, that the duties thus mentioned, are the ordinary and current transactions of the office; for if the extraordinary business of the election had been deemed proper for none but commissioners fully installed, it is not easy to see why the services of those about to retire, should not have been retained for it; or why they should retire for any purpose, before their successors are ready to take their places. As to the time of taking the oath, there is nothing in the words to prevent it from being administered when the commissioners first take their seats, such being the practice in the legislature, where it is constantly done, even though it be certain, that the election of the member is to be contested. The inquiry, then, seems to be, whether a statute, which authorises a person to determine a question in which his own rights are incidentally involved, be void, independently of constitutional limitations; and I hold it is not. *The Com-*

*monwealth* v. *Woelper et al.* 3 *Serg. & Rawle,* 43, in which I expressed an opinion, that one who acted as a judge of the election, was *ipso facto*, disqualified from accepting the office, involved no question of the validity of a statute. But it is unfair to treat this as the common case of a judge deciding his own cause. It might have been unsafe to confide the final decision to the commissioners, without infusing into the Board a portion of the popular sentiment that prevailed at the election; and this was evidently the motive for associating the new commissioners with the old. It is, therefore, not so much their own franchise, as that of the electors on which they were intended to adjudicate. On this distinction it was, that Mr. *Fox,* (than whom, no man was more profoundly skilled in constitutional principles,) asserted his right to vote in what had been called his own cause, during the debate on the celebrated *Westminster* scrutiny. But it is demonstrable, that not even the personal interest of the individual, would be promoted by permitting him to vote on his title to the office. Though returned jointly, the commissioners are elected severally; in so much, that some of them may be elected by illegal votes, while the votes of the others may be above suspicion.

Now, as the Board must necessarily pronounce separately on the election of each, according to its peculiar merits, I can discern no reason on the score of community of interest, to exclude the other two. Then, suppose the Board to be constituted of eight, who are equally divided on the election of the ninth; and the consequence is, that the return would be established for want of being successfully impeached; because, if that were not so, the new commissioners would neither be admitted nor rejected, nor could a new election be ordered. The vote of the ninth, therefore, could produce no effect, but when given in a way to turn the scale against himself; and, it seems to me, the public ought not to be deprived of the benefit of that contingency, however remote it may appear to be. If the eight were divided unequally, the vote of the ninth could produce no effect whatever. Now, strike out all the commissioners elect, and we shall obtain exactly the same results with the Board constituted of six. The only effect, then, which the votes of the new commissioners can produce, is to prevent a majority of the old Board from controlling the public will—the very point which, it seems to me, the legislature intended to secure.

On the last point, I have the misfortune to differ from all my brethren. By the act of 1722, the powers and jurisdiction of this court, are declared to be the same as those of the King's Bench, which grants writs of *Mandamus,* to restore officers of corporations, and freemen wrongfully disfranchised, as well as informations in the nature of *Quo Warranto,* against usurpers of the franchises of the crown; and, in the exercise of its visitatorial powers, corrects abuses by judging of the circumstances and merits of the complaint. But even conceding to this court a concurrent jurisdic-

(The Commonwealth *v.* M'Closkey and others.)

tion with the commissioners, yet the judgment of a court of competent jurisdiction, directly on the point, is, when coming before another court of concurrent jurisdiction collaterally, conclusive of the fact adjudicated. The Court of Common Pleas has concurrent jurisdiction where the cause of action is of less value than a hundred dollars; yet, it would not be competent to re-examine the judgment of a justice of the peace in a collateral proceeding, further than to ascertain the question of jurisdiction. So, the Court of Common Pleas and this court, have concurrent appellate jurisdiction of proceedings, under the landlord and tenant act, and perhaps in a few other cases; yet, after affirmance or reversal in the Court of Common Pleas, there is no means of drawing the matter into controversy here, but a writ of error to that court. In courts of common law, the rule is without an exception. The case of a prisoner remanded on a *Habeas Corpus,* may be reheard on a fresh writ, but only because the order is not a judgment that may be made the subject of error, or a *Certiorari.* This court has, however, not even concurrent jurisdiction. As it cannot take cognisance of the election return before the commissioners have pronounced on it, the original jurisdiction of the Board must necessarily be exclusive. As, therefore, this court has no other jurisdiction of the proceedings of that tribunal, than what it may exercise in respect of the proceedings of every other inferior court from which an appeal is not given, and whose errors are subject to correction only for irregularity, it cannot now pronounce upon the legality of the return: so that, from the principle held by the majority on the main point in the cause, it would seem to follow, that the rule ought to be made absolute as to all, whether the validity of the election were competently determined against the respondents by a majority of the old commissioners, or not determined at all. I am, however, for discharging it as to all.

Huston, J.—Our ancestors brought with them a portion of the common law, and of the common law proceedings, and where we have used the one or the other, it is not for this court to lay them aside without good reason.

Where, however, on trial, either has been found impracticable, or useless, I would not adhere to even all those in use; much less would I go back to search for those abandoned in the country where they originated. Where they have been used, but the form of our government, our legislative provisions, and especially the express words of our constitution forbid a continuance of them, I would suppose we have no power to use them.

Even in *England,* informations have always been odious, and there they have been forbidden or modified by both legislature and judiciary. Here I have always believed they were expressly prohibited; no person, for any indictable offence, shall be proceeded against criminally by information, "except in cases arising in the land or naval

(The Commonwealth *v.* M'Closkey and others.)

forces, or in the militia, when in actual service in time of war or public danger, or by leave of the court, for oppression or misdemeanor in office." *Con. Art. IX. Sect.* 10. The first part of the expression in this sentence is not, to me, very intelligible—"proceeded against criminally." An information is always a criminal proceeding: it differs from an indictment or presentment only in this, that the latter is founded on the presentment of a grand jury, the former is not. It is essentially a criminal proceeding in its form, and in its consequences. The law on it is found in *Treatises on Criminal Law.* It is always called a prosecution. It is true, it is used to try a right to an office or franchise sometimes, and so is an indictment for a forcible entry and detainer; and so may be an indictment for assault and battery. It is not usual, where it is used to decide a right to impose a heavy fine, nor is it when an indictment is used for the same purpose, "by leave of the court, for oppression or misdemeanor in office." In such cases, in *England*, no leave of the court was necessary; nay, it would be refused. The attorney general must proceed, the court will not direct. Here, it is required in those cases, and the cases in which that leave is necessary, in *England*, are totally forbidden. The leave of the court will only justify it in the cases specified. Oppression and misdemeanor in office are as different in phrase as in meaning, from usurping an office. The first admits the office to be legally held, but goes to punish crime in administering it, and is clearly a criminal proceeding; the last denies the person to be an officer, and goes to punish him for assuming an authority not given him by the law, and is as clearly a criminal proceeding. It is indictable, and constantly, as often as it occurs, indicted in every county in the state, and is so in *England.*

I have said, this power of granting leave to file informations in the nature of *Quo Warranto,* has been modified in *England.* The act of 4 and 5 *William & Mary, c.* 18, compels the persons at whose instance the motion is granted, to enter into recognizance in twenty pounds, to pay the costs in case of non-pros or acquittal of the defendant. The act of 9 *Ann. c.* 20, regulates the whole proceedings, and gives all the costs, though they may exceed twenty pounds, and applies all the statutes of jeofails to these proceedings; these acts are neither of them in force here, and if we grant the information, it is at common law, and the defendants must pay the costs, although they are acquitted. All our acts of assembly relative to costs in criminal proceedings, relate to; and speak of grand and petit juries, and indictments. The legislature were not aware, that informations lay against every officer of every county, township, and borough, and corporation in the state.

An old act of assembly, gave this court power to exercise the jurisdictions and powers thereby granted, as fully and amply to all intents and purposes whatsoever, as the Courts of King's Bench, Common Pleas, and Exchequer, or any of them may or can do.

(The Commonwealth *v.* M'Closkey and others.)

But in 1791, this was limited to such powers as may be exercised consistently with the constitution of the state; and many acts of assembly have lessened those powers still more. We have not, as a Supreme Court, the power to summon a grand jury; except that now claimed, we have no original criminal jurisdiction. But this court has decided, that it had this power, and in one instance since I was on this bench. That is not a conclusive reason why it should always decide in the same way, or that I, even if I thought so then, which I did not, should on reflection continue of the same opinion. It was also decided, or said in that case, that this court had the right of granting or refusing leave to file an information, according to circumstances. *The Commonwealth* v. *Arrison,* 15 *Serg. & Rawle,* 127. And this court has since refused to grant leave in one case, because of the smallness of the corporation. I incline to the opinion, that this cannot be supported, and that if we grant it as to the officers of one corporation, we must do it to all. I do not agree, that a remedy is open to rich and powerful corporations, and is not to small and poor ones, and that they have no redress in any case of usurpation of their offices. This is against the letter and spirit of all our institutions. It is said, let them indict whoever usurps an office: it gives up the question. It is then an indictable offence, and our right is forbidden by the constitution; if it is not indictable, we must try all that offer, and we can do nothing else.

But there are other reasons: there is no *Nisi Prius* Court issuing from this court, except in the county of *Philadelphia;* and no one county has any exclusive rights, or any remedies, except what are given by positive law. All the corporations, all the boroughs, all the counties, then, have not this common law remedy, and every *tontine* establishment, falsely called charitable, must take up our time in trying whether the voters were disqualified by gaming, or intoxication, or having the venereal disease, which are standing disqualifications in all of them. It has been said, we may send the issues to be tried in the Circuit Court, but I apprehend, this has been said without reflection: that is, a court of very special jurisdiction; all it has is given by act of assembly, and nothing can be found, giving us power to originate causes to be sent to that court. Besides, our original jurisdiction is expressly confined to civil suits, by the fourth section of the act of assembly of the 25th of *September,* 1786, and by the act of assembly of the 20th of *March,* 1810, confined to suits where the matter in controversy shall be of the value of five hundred dollars; and by the first section of the act of assembly of the 24th of *February,* 1806, no issue, in fact, shall be tried in bank in the Supreme Court, but only at *Nisi Prius,* and the Circuit Court was in full operation at that time.

This township of *Moyamensing* is, to be sure, a corporation, but one of a peculiar kind; it is, *quasi,* a county for particular purposes. Informations of this kind have not, I believe, been granted against county or parish officers in *England,* and I am not satisfied that

(The Commonwealth *v.* M'Closkey and others.)

we have the power to revise and examine township and county elections, which townships and counties are part of the government of the state, and not the kind of corporations to which this remedy can or ought to be applied. We have no power to interfere or control the machine of government, except it is expressly given us; and are equally prohibited, whether the support of the poor, or the support of the government is to be affected by our intermeddling. But if we had all the power which the complainants wish, and that power as arbitrary a discretion as they could wish, there is no reason for our interference in this case. If we can be supposed to have any reasonable wish, if any legal object is in view, it must be, that those who were duly elected shall fill the office. The essence of the matter is a majority of legal votes. Now, there is not only no proof, that the three men returned as elected on the third Friday of *March,* had not a majority of legal votes, but, to me, there is conclusive evidence that two of them had, and even that all three had. One of them had seventy votes more than the highest candidate on the opposing ticket, the next had eight, and the third had three more, and yet, all are asked equally to be removed. Now, there is no colour of evidence to affect two, and no legal evidence to put the third to answer. The complainants before us have attempted to prove, that three illegal votes were given. Testimony was taken *ex parte,* on this subject, immediately after the election, and as to one, is at best, doubtful. On the 13th of *April,* when the four old commissioners investigated the matter, there was only proof of two illegal votes given; yet, they set aside the election of all three respondents. But what is not to be forgotten, one of those commissioners swears expressly, they did not inquire whether those two votes were given for the respondents or not. I do not mean to speak disrespectfully of the institutions of my country, but I say, I believe there never was an election for county officers in any county in this state, at which there was not one illegal vote given. Now, these commissioners went on the ground, that it was not necessary so many illegal votes should be given, that those votes, subtracted from the successful candidate, would put him in a minority. No—one illegal vote, in their opinion, vitiated the election of him who had seventy of a majority, and that, too, without any evidence that, that vote was given for him, or procured by him; nay, I would say, with knowledge, that it was not; for if it could have been proven, that these men voted for the respondents, it would have been. The highest number of legal votes is what decides, and what ought to decide all elections; every thing else is form; and when this is ascertained in any contested election in any tribunal of which I have any knowledge, the man having this highest number, is declared duly elected.

If we adopt *English* forms, let us take *English* rules of proceeding. There, the court will require the same evidence to support the motion, which would support an indictment; (3 *Wilson's Bac.* 641,) and if the court are satisfied there is no reasonable cause

(The Commonwealth *v.* M'Closkey and others.

for the prosecution, they will not grant the information. *Ibid.* It is not granted, except upon affidavit, stating facts, which if true, doth, for its enormity or dangerous tendency, seem proper for the most public prosecution. 2 *Hawk. P. C. C.* 26, *Sect.* 8. If the object is to try a civil right, which has not been determined, or if the complaint is vexatious, &c. it will not be granted. *Ib. Sect.* 9. The court will be guided by the fairness and merits of the party applying. *Rex* v. *Miles,* 1 *Stark.* 468. 3 *Wilson's Bac.* 641, and cases there cited.

Now, will this court grant an information against any officer, no matter what his majority, if one or three illegal votes are proved, and must not an application for such prosecution be necessarily vexatious, where, if all that is alleged is true, there is still a majority of sixty-seven?' or, can the commissioners, who, without proof, and against proof, set aside the election of the two highest, have any merits on their side, or have they given evidence, of any wish or intention to regard law or justice. It is, however, said, that we have nothing to do with the election; that after the election is over a return is to be made to the commissioners in office, and to the three newly elected; and that the old commissioners alone have the power of approving or disapproving, and that the act of the majority of the old commissioners is binding on this court, and all the world, no matter how flagrantly absurd or wicked it may be.

The township was incorporated by the act of assembly of the 24th of *March,* 1812. · 5 *Smith's Laws,* 341. The third section is as follows:—" The nine persons who shall, at the next election to be held in pursuance of this act, have the highest number of votes for the office of commissioners, shall meet together at the house where the regulators for the northern district of the said township now meet, between the hours of two and four o'clock in the afternoon of the first Monday in *April* next following the said election, and that the three persons who shall at every subsequent election, have the highest number of votes for the office of commissioners, together with the six commissioners whose time shall not have expired, shall meet together in such place as shall be legally appointed, between the hours of two and four in the afternoon on the first Monday in *April* next following each and every election to be held in pursuance of this act, and shall then and there receive the returns of commissioners elect, and shall forthwith proceed to examine the same, and to judge and determine thereon: and for that purpose, the said commissioners so met, or a majority of them, shall be judges of the said election, and shall have full power and authority to approve thereof, or to set aside the same, and to order a new election, *as the law may require,* to be held," &c. "*As the law may require:*" do not these words control the authority to approve or set aside, and if we have any power in the matter, authorise us to examine and decide *whether the law required* the commissioners to do what has been done in this case?

(The Commonwealth *v.* M'Closkey and others.)

But to go to the construction of the whole sentence, for the section is but one sentence. · Clearly, after the first election, the nine commissioners had, under this law, to receive the return, to judge, and determine, and approve of their own election, or set it aside and order a new election, as the law might require; and as clearly, if resignations, removals, or deaths, should, at the end of any year, leave the township without any commissioners, the nine then elected must also decide on their own election. In ordinary cases, leaving out words of circumstance of time and place, the sentence stands. The three persons who shall have the highest number of votes, and the six old commissioners, shall meet together and receive the returns of the commissioners elect, and shall forthwith proceed to examine the same, and judge, and determine thereon. So far, no ingenuity can raise a doubt; the whole nine are to be together, to receive the returns, and to judge and determine thereon. The sentence proceeds, and *for that purpose, the said commissioners so met,* or a majority of them, shall be judges of the said election, and shall have full power and authority to approve thereof, or set aside the same, &c. &c.

For that purpose—although they all, or some of them, may never be commissioners for any other purpose, yet, for the purpose of judging and determining, the law gives them this special power. The *said commissioners so met.* The preceding clause had told most explicitly who were to meet, and who were to judge and determine, and this one says, the *said* commissioners so met, are to approve or set aside.

The counsel for the relators says, the word, commissioners, in the last clause, distinguishes those who were previously in office, from the three commissioners elect. · In the first place, this was not the meaning after the first election, when all were commissioners elect; and it would not be the meaning, if any event should require the election of nine, and the law makes no discrimination between those cases and the election of ordinary years. And in the next; the whole nine, in all cases, are to receive the returns, and judge and determine thereon; and it would not be very easy to find why nine should judge and determine on a matter, and yet, six, or a majority of six, should reverse that judgment and determination; why nine are to judge and determine, and yet, in the same sentence, four of the same men are to have full power to reverse that judgment and determination.

We are told, however, that it is unconstitutional, nay, much worse than that; to appoint any person a judge in his own cause, that even a parliament, whose power of legislation has no limits, cannot do this. Then, the charters of *Philadelphia, Pittsburg,* and *Lancaster,* are all void, for the branches of those corporations have that power expressly, and exercise it every year. Oh! but this is from *necessity.* What necessity? Might not the aldermen

(The Commonwealth *v.* M'Closkey and others.)

of those cities, or the Court of Quarter Sessions, or the Court of Common Pleas of the counties, receive and judge of the returns? There is no more necessity in those cases than in this; nor any thing more unreasonable in this than in that of the common and select councils; or, than in giving in this *Moyamensing* corporation, the whole funds to the commissioners, with no accountability to any other body. The words *void, unconstitutional, beyond the power of the legislature,* &c. &c., are used so indefinitely, as to produce no other effect than to lengthen a speech, by supplying the place of precise argument; and the phrase, "judge in his own cause," seems to be often totally misunderstood. As to right to property, a man cannot be a judge in his own cause. As to political rights, the phrase cannot, perhaps apply; the saying is seldom true. Every judge in the state is judge of the legality and extent of his own power; in this respect, the decisions of inferior courts are subject to revision. That of this court is not. If this court was extinct by law or the change of the constitution, and a new court organised under commissions from the same source, in the same form, and of the same date, it must judge of its own rights to the power of office, and the emoluments of office.

When a right to an elective office is questioned, two rights are questioned, that of the person elected, and those of the electors. If the inhabitants of a district elect a man, to whom they confide the power of taxing and applying the taxes, is it strange, they should confide to the same person the power of judging for the same period of their right to vote? There is, and must be, in all free governments, much depending on the confidence of those who elect: and they elect with a view to all the authority which the law gives to the officer, because, they are willing to confide it all to his honesty and capacity. When it is found all cannot be safely trusted, a law divides, gives part to some other hands. The constitution, itself, gives to each branch of the legislature the right to judge of the elections of its own members. If one illegal vote in a county makes an election void, every one in the house is judging in his own case; and if the matter is so bad, or so wicked, as is pretended, we must amend the constitution, and provide, that each branch shall not judge of the election of its own members, but may of the members of the other branch. There is no weight in this objection against a positive law; and if the law were as contended for, it would in no respect mend the matter. Not practically, for if the three newly elected were sole judges of their own election, no more objectionable decision could be given, than has been in this case. Nor is it more free from objection on another ground, for if the six can set aside one election without reason, and against reason, they may do so as often as an election is had, and keep the power in their own hands, which is as much judging in their own case, as that objected to.

(The Commonwealth *v.* M'Closkey and others.)

As to the time of administering the oath.    Some of the *English* cases are very strict, but that is generally, if not always, where a particular person is to administer it; and it seems to be held, in some one or two cases, that a literal compliance is necessary, even though a man would have to be sworn in before himself. The act in question is section fifth: "That each commissioner who shall be elected and returned, and whose election shall be approved of in manner aforesaid, shall, before he enters on the execution of his said office, be sworn before some justice of the peace," &c. &c.    If we consider the act of judging and determining on the election as a personal trust, given to the three who are returned, which they are to exercise, though they may never be commissioners, then the oath would be more proper after; but the time when it is to be taken is not expressly specified.    The oath does not confer the office.    The commissioner is to be elected, returned, the return approved, and he to be sworn.    Although this order may be perhaps the most proper, I would not disturb a corporation on that account.    I would say, it was a vexatious complaint.    I consider the election, the highest number of legal votes as giving the right to the office to the person elected, and the right to his service to the corporation; and the approbation, by a majority of the nine, as completing formally that right.    If the old commissioners alone could approve, I deny their right to set aside the election without proof or against proof.    The votes are the substance, the approbation merely a formal part; if it is essential, and to be governed by no rules, the election is idle; it is a mockery.