[ PHILADELPHIA, MAY 2D, 1840. ]

5wh   551
37SC  201

## BOSHART against EVANS.

### IN ERROR.

A testator directed that immediately after the death of his wife, his house and lot of ground should be " valued  or appraised by three or more creditable and judicious men ;" and if his son A. should choose to take the messuage and lot at such valuation, then he devised the same to him in fee, he paying to the testator's son J. one-third, and to his daughter B. one other third-part of the valuation : and if A. should decline to take at the valuation, then he devised the messuage and lot to his daughter B. in fee, she paying to his son A., or his representatives his third-part of the valuation : But if both his son A. and his daughter B. should decline to take at the valuation, then he directed his executors to sell, and gave the proceeds to his three children, A., B. and J.   He gave certain legacies, and bequeathed the residue to his three children.   He appointed his son A. and his son-in-law G. (the husband of B.) executors.   By a codicil, dated a few days after the will, reciting the death of his son A., he devised " all the legacies and estates intended for" his said son, to the three children of his said son, and appointed F. B. executor in place of his son.   The three children of A. were minors at the death of the testator.   *Held,* (1) That the power of appointment of the appraisers was not in the executors, but in the devisees under the will.   (2) That under the codicil the children of A. succeeded to the right of election given to their father.   (3) That one of the children might maintain ejectment against the heirs of B., to recover his share.

ERROR to the District Court for the City and County of Philadelphia, to remove the record of an action of ejectment, brought by George Boshart against Martha Evans, to recover one undivided ninth part of a certain messuage or tenement and lot or piece of ground, situate on the west side of Third street, between Vine and Sassafras streets, in the city of Philadelphia.

On the trial, before PETTIT, (Pres't) on the 15th of May, 1838, the plaintiff proved that one Andrew Boshart died seized of the premises, having made a will, dated the 23d of October, 1793, containing the following provisions :

" First. I will that all my just debts and funeral expenses shall be duly paid and satisfied, as soon as conveniently can be after my decease.   Item. I will and direct that my beloved wife Christina

(Boshart *v.* Evans.)

Catharine shall have the use, interest and income of my messuage and lot on the west side of Third street, where I now dwell, and of all other my estate whatsoever, during the term of her natural life. And immediately after the decease of my said wife, my said messuage and lot of ground on Third street, with the appurtenances, shall be valued or appraised by three or more creditable and judicious men; and if my son Andrew Boshart shall chuse to take the said messuage and lot at such valuation or appraisement, then I do give and devise the same messuage and lot with the appurtenances unto him my said son Andrew, his heirs and assigns forever; he and they paying to my son Jacob Boshart, or his legal representatives, one full equal third-part, and to my daughter Barbara Geyer, or her legal representatives, one like full equal third-part of the sum and moneys at which the said messuage and lot shall be valued or appraised as aforesaid. And if my said son Andrew shall refuse or decline to take the said messuage and lot at such valuation, then I do give and devise the said messuage and lot unto her my said daughter Barbara Geyer, her heirs and assigns forever, she paying to my said son Andrew, or his legal representatives, his equal one-third part of the valuation aforesaid. But if both my said son Andrew and my said daughter Barbara decline to take the premises at such valuation, then I do direct, authorise and empower my executors hereinafter named, and the survivor of them, to bargain and sell my said messuage and lot for the best price that can be gotten, and by proper deed and assurance in the law to grant and convey the same to the purchaser or purchasers thereof, his, her, or their assigns forever. And all the moneys arising from such sale I do give, devise and bequeath unto my said three children, Andrew, Barbara and Jacob, to be equally divided between them, or their legal representatives, part and share alike, as tenants in common.

Item. After the decease of my said wife, I do give and bequeath out of my personal estate unto my said son Andrew, the sum of twenty pounds; unto my step-daughter Catharine Cooper the sum of twenty pounds, to be paid her by instalments in three annual payments; and unto my step-son Matthias Gensel, an annuity of three pounds per annum during his natural life, from the day of my said wife's decease; and all the rest, residue, and remainder of my estate, I do give, devise and bequeath unto my said three children, Andrew, Barbara and Jacob, their respective heirs, executors and administrators, to be equally divided between them part and share alike as tenants in common; Provided always, that what I have herein given and bequeathed to my said wife is in lieu and full satisfaction of all her dower or thirds in my estate, and not otherwise.

Item. I do nominate and appoint my said wife Christina Catharine, executrix, and my said son Andrew Boshart, and my son-in-law, Andrew Geyer, executors of this my last will and testament."

(Boshart *v.* Evans.)

The following codicil was then given in evidence.

" It having pleased the Almighty, since the date of the foregoing will, to call out of this life my son Andrew, I do therefore make this codicil and will and devise all the legacies and estate intended for my said son unto his three children Catharine, George and John Boshart, and to their respective heirs and assigns in equal parts as tenants in common. And if either of my other two children depart this life before me, the lawful issue, if any, of such decedent shall in like manner take and inherit the part and share of my estate intended for his, her, or their deceased parent. Lastly I do appoint Frederick Beates, instead of my son Andrew, executor of this my will. Witness my hand and seal this 26th day of October, 1793."

The will and codicil were proved on the 8th of February, 1796.

The following valuation of the premises was then given in evidence.

" We, the subscribers, appointed to value the house in Third street, in which Mr. Andrew Geyer now lives, have agreed that the value thereof is one thousand pounds.

GEORGE FOREPAUGH,<br>
GODFREY HAGA,<br>
PETER CRAFT.

Philadelphia, 10th March, 1797."

A power of attorney from George Boshart to his sister Catharine Boshart, dated the 18th of October, 1813, and an indenture of bargain and sale, dated the 3d of November, 1813, between Catharine Boshart and George Boshart, by his attorney, Catharine Boshart of the first part, and Barbara Geyer, Andrew Geyer and others, the children and issue of Andrew Geyer, whereby, in consideration of two hundred and twenty-four pounds, the parties of the first part conveyed to the parties of the second part all their shares, right, title and interest in the premises, were then given in evidence; together with the account of Andrew Geyer, as guardian of Grace Boshart.

Parol evidence was then given on the part of the plaintiff, to show the situation of the family, and that the premises were worth considerably more than the valuation; and on the part of the defendant to show the respectability and competency of the persons who made the appraisement; and other matters; all which are sufficiently stated in the charge of the Court.

The learned judge charged the jury in substance as follows:

" This is an action of ejectment, brought by George Boshart against Martha Evans, the tenant of Barbara Geyer and others her children, who are the real defendants in this cause.

(Boshart *v.* Evans.)

The plaintiff claims, under the will of his grandfather, Andrew Boshart, the right to the possession of one ninth-part of a house and lot in third near Vine street in this city.

The grandfather, Andrew Boshart, died on the 4th of February, 1796, having for many years owned the property in question.

He left a will dated the 22d of October 1793, with a codicil dated the 26th of October, 1793.

His wife had died on the 31st of October, 1793, and the executors named in his will and codicil, who survived him, were his son-in-law Andrew Geyer and F. Beates.

The will and codicil were proved on the 8th of February, 1796, and letters testamentary granted to Andrew Geyer, as sole acting executor, Mr. Beates declining to act.

When Andrew Boshart, Sen., made his will on the 22d of October, 1793, he had three children, Andrew Boshart, Catharine Geyer and Jacob Boshart.

When the codicil was made, four days afterwards, his son Andrew had departed this life, leaving three minor children, Catharine, George (the present plaintiff) and John, aged respectively nine, seven and five years.

Before Andrew Boshart, Sen. died, Andrew Geyer, his son-in-law, was the guardian of the children of Andrew Boshart, Jun.; and the children lived with their guardian. So far there is no dispute about facts, they being either proved or conceded. This was the state of the family at and before the time of the death of A. Boshart, Sen.

Then what were the contents of the will and codicil?

(The judge here read both the will and codicil.)

Two questions are presented here—

1st. Supposing a valuation duly made—had Barbara Geyer a right to elect to take the house in Third street at the valuation; she paying Andrew Boshart's three children one-third part, and her brother Jacob one-third part of the value?

2d. In whom was the power of appointing appraisers?

As to the first question—there are three prominent objects of the will showing the intention of Andrew Boshart, Sen.

1. Equality among his children, or in case of the death of either, a substitution of his or her children for the deceased party.

2. That the property should remain in the family, if his son Andrew, or Barbara, desired to have it, at a fair appraisement. Jacob, it is in evidence, lived in Kentucky, and that may possibly account for his not having a choice.

3. If not taken by either at the valuation, then a sale at once, and a division of the proceeds.

Now what construction of the will and codicil will carry into effect the general intent thus manifested? Three constructions may be suggested:

1. That every thing about value and sale is to be rejected.

This cannot be sustained with any show even of plausibility. If such was the design it would have been easy to say so in the codicil, and thus let the fee in the house pass directly under the will to Barbara, Jacob and the three children of Andrew; and it would defeat the design of letting the property remain in the family.

2. That the valuation and appraisement be postponed till the youngest child should reach the full age of twenty-one years. This would clearly defeat the equality, for it would postpone Jacob's interest till that period, and would tie up the property for many years; an object plainly opposed to his views, which were an immediate vesting of title in one who could sell, or an actual sale by the executors.

The third construction is, that there should be a valuation, and that Barbara should have the election at once.

Andrew was not alive either to refuse or decline. His children were incompetent to choose from infancy, and their guardian had no power to decide for them. And as Jacob's residence in another state, or something else in regard to him, and it is not material what it was, was deemed a sufficient reason why he should not have a choice, but was to have the benefit of the principle of equality of interest, through the means of a valuation, " by three creditable and judicious men," or by an early sale by the executors; so, the infancy of Andrew Boshart, Junr.'s children, and their consequent inability to choose, might have been and was considered a sufficient reason for letting them have the benefit of the principle of equality, by means of such a valuation, or by an early sale by the executors.

The testator clearly thought a fair distribution could be made by either of these modes. The right of election to take the house at a valuation, was not designed to give any advantage in amount of property. It seems to have been intended to gratify, as far as the facts would permit, without prejudice to any one, an innocent feeling of family pride, in the retention among them of the homestead of the testator. This view renders it unnecessary to resort to the suggestion that the children being incompetent to take may be deemed to have *refused* or *declined,* a suggestion, I think, without force, as refusal or declination implies the power of choice. Inability to choose, however, leaves the way clear for the operation of the other modes of effecting the general object of the testator, which were equality of interest and an early sale, or the immediate vesting of a full power to sell.

I am clearly of opinion then, that the true construction of the will and codicil authorised a valuation " by three creditable and judicious men," and an election by Barbara to take the house at the valuation. There is every motive for this, looking to the true interest of the children. And this I say, notwithstanding the confidence of the plaintiff's counsel.

Then the question is presented, who was to appoint the appraisers?

(Boshart *v.* Evans.)

The language of the will is " my said messuage and lot of ground on Third street, with the appurtenances, shall be valued or appraised by three or more creditable and judicious men." Now in the absence of any express direction as to the mode of appointment and of any express legal provision as to the power of any Court on the subject, it becomes the duty of the executor to carry out the intention of the testator. He is the designated agent; no precise form of *words* being necessary. " When by will an estate is to be sold without declaring by whom, if the fund be distributable by the executor, he will have power to sell by implication." *Sugden on Powers,* 72.

Here the direction is that three creditable and judicious men should do a certain act. The executor was to execute the will; and it became his duty, and it was within the scope of his authority, to designate three creditable and judicious men to do that act and make the valuation. The testator had the power and right to give this power to his executor, and he did give it. His confidence was in the executor. His son Jacob was to be bound by the valuation so made. His grandchildren, A. B. junr's. children, were to be bound by it. No one could complain of this. The testator had sufficient confidence in his son-in-law, A. Geyer, to trust him with this power, and we are not to question his wisdom. He presumed he would exercise the authority fairly for the children of A. B. jun.; and it was his pleasure that they should be bound by the exercise of this power. Nor is it enough to defeat it, that the executor's wife was to elect under the valuation : the interposition of the judgment of three creditable and judicious men, was deemed sufficient in the view of the testator, who perfectly knew the state of the family. If Mr. Geyer then, the executor, selected three men whom he believed to be creditable and judicious men, the power of appointment was legally executed. Even his judgment, honestly exercised, as to the credit and judgment of the appraisers was to be conclusive; though this point is not material. It is not to be overlooked that a much higher power than that of appointing appraisers, namely, the power to sell in a certain contingency, was expressly given to the executors. The power of appointment thus exercised without fraud, would conclude all the world, in all future time; and this merely because the testator having confidence in the executor and having power so to order it, did so order it. This being the law of the case, these questions of fact are presented—was the appointment made by the executor, and was the valuation made by the persons selected? The defendants say both were done, and rely much (*inter alia*) upon the small paper given in evidence by the plaintiffs themselves; and the jury are to decide. The defendants say it is clear in point of fact, that " George Forepaugh, Godfrey Haga, and Peter Craft," were appointed by the executors to make the valuation. And they say it is clear that these gentlemen valued the house and lot at one thousand pounds, and so the case was argued on both sides. The

facts here are for the jury. If not named by the executor, it does not appear who did name them, and no one else had the power to name them. The certificate is addressed to the executor, and it is not disputed that the executor recognised their action as appraisers. It was so opened by the plaintiff's counsel. The appraisement, if made, is conclusive without evidence of fraud. As to the identity of the house, it is not seriously disputed, but this is for the jury. But if the question were open, what better light have we now as to the value in 1796–7, than those men had at that time? Who were they, and what is the testimony as to the value? (The Judge here referred to some of the evidence.) If then the valuation was duly made, and Barbara had the right to elect, the question comes up, Did she elect? She and her husband took possession of the house and lived in it, and after the valuation kept possession. If there was no election, then the executor ought to have sold. His not selling and keeping possession, might be considered as binding him and her to an election. If the property had decreased in value, and probably it would have been so considered, it may be argued, why not then let them be deemed evidence of election in their favour. No written election was necessary, though it would have been prudent, and would have saved much trouble. But if it appears to the jury in any other satisfactory way, it is enough. And in that case the title vested in Barbara under the will of her father, she paying the two-thirds of the valuation to the children of her brother Andrew, and to Jacob her brother. How was she to pay? Her husband was guardian of those children, and there is no claim on the part of Jacob. Indeed, I rejected as immaterial, till such claim appeared, the offer by the defendants, of a deed by Jacob in 1797. Her husband as a guardian, would in this case be obliged to account for one-third. It is said he did so account through his administrator, when the children became of age. In the account exhibited, the children, it is alleged by the defendants, have credit for the third part of the valuation of £1000 from the year 1797. The balance paid over in 1813, it is contended by the defendant, was the result of that payment. It is said the charges against the children are too great: this is denied by the defendants, considering the infancy and the care and superintendence.

But if Barbara took at the valuation, her husband and her estate became responsible, and if there was objection to the guardianship account, it could have been settled in the Orphans' Court, a more convenient tribunal than this one for such a settlement. With what favour or disfavour George would have been heard in that Court, after receiving from his sister the money, after waiting till 1828, when this suit was brought, fourteen years after the settlement in 1813, and seven years after his return from abroad, which was in 1821, it is not necessary to inquire. If the jury adopt this view of the facts, namely, that there was an

appointment by the executor of the appraisers, a valuation accordingly under it, and an election by Barbara, then I am clearly of opinion that in point of law the present plaintiff has no title to sustain this suit which is an ejectment. Any complaint as to the settlement of his guardianship account, if on this view of the law there is ground for it, cannot be investigated legally in this suit.

The defendants say, however, that they do not rest upon what was done by the executor as to the appointment of the appraisers, and by the appraisers as to valuation, and by Barbara Geyer as to an election. They say the present plaintiff agreed to and confirmed every thing, when he became of age, by his letter approving of his sister acting or officiating for him in 1813; by the power of attorney to her to convey to his aunt and cousins, in 1813; by his receipt of the money from his sister, long after; and by his silence for fourteen years before the suit was brought, and for six years after he came home from public service abroad. He was twenty-three years of age in 1813, and *prima facie* had power to contract and to settle with his cousins. The plaintiff says he was recently of age, that the property and all knowledge in regard to it was in possession of the other side; that a settlement with his guardian for less than what was due would not bind him; and that the administrators of his guardian having charge of the property and papers, are in no better a situation than the guardian himself. If in 1813 the property was worth more than £1000, and the guardian or his administrator, without giving an opportunity to the ward to understand the subject, obtained a deed of the property at less than its value, it would not bind the ward, if he within a reasonable time made objection; and this is true, though no actual fraud or circumvention was proved. If, however, the valuation was made fully and properly in 1797, and an election took place under it by Barbara, then the circumstance of the release or deed of confirmation, or deed of conveyance of 1813 by George, assumes a different aspect altogether: as without it George had no title, so it could give him no advantage. If done from an abundance of caution, if to close up a presumed obscurity in the will, and make doubly sure a title which was strictly good without it, then the notion of imposition vanishes; the idea of legal fraud has no foundation, and the transaction may be allowed to stand: this, it appears, probably led to this controversy; it ought to be allowed to do no further harm, if it can do no good. If not so done, then the jury would have to determine, and so the plaintiff has argued, whether George had a fair settlement in 1813, or not. As to the time of objection, if the case rested on the settlement with George in 1813, independent of the previous valuation and election, and the jury deemed the price inadequate, and George within a reasonable time objected; the jury might, under all the circumstances, disregard the settlement, and the executors of A. B. senr., not having

(Boshart *v.* Evans.) .

sold the property, a verdict might be given for the plaintiff here. Whether George made his objection within a reasonable time, would be for the jury. He was abroad for some years, or only occasionally here; he came home in 1821, a man of thirty years of age, and waited six years before he brought suit. He received the money from his sister, and never offered to return it. In 1835 he made oath in the Insolvents' Court, that he had no real estate; and hence the argument now is, that he waited more than a reasonable time before bringing suit, and since suit, has virtually admitted that he has no claim. The plaintiff contends that it was not too late when he brought suit, that he never acquiesced before or since suit brought; and on the argument on both sides, the jury will have to determine. If, however, there was by three creditable and judicious men, duly appointed, a valuation, and there was an election by Barbara, then the case is different and the plaintiff cannot recover; and this concludes nothing as to the guardianship account. If there was no such valuation, and no such election, the jury will decide upon the transactions of 1813, and subsequent years, upon the principles stated."

A bill of exceptions was taken to this charge; and the jury having found for the defendants, a writ of error was taken, and the following specifications filed.

" 1. The judge charged that Andrew Geyer was entitled to appoint the appraisers.

2. The judge charged that Barbara Geyer had the first election to take the house at the valuation.

3. The judge charged that if Andrew Geyer appointed three men whom he believed to be creditable and judicious men, the power of appraisement was legally executed, and he put it to the jury to find for the defendant, if the appointment was made by the executor, the valuation by the person by him selected, and the election by Barbara Geyer.

4. The power of appointment and the election were not duly executed, and did not, without a conveyance in writing beside, transfer the title.

5. The judge charged that the jury might find for the defendant, without regard to what happened in 1813.

6. The judge charged upon the subject of the payment of the consideration of the alleged conveyance by the plaintiff, as if it were a mere question of jurisdiction of the guardianship accounts between the Orphans' Court and the District Court, or a mere question of the fact of payment; when he should have charged upon it as an item in the question of fraud and imposition practised upon the plaintiff."

(Boshart *v.* Evans.)

Mr. *A. H. Smith* and Mr. *C. Ingersoll,* for the plaintiff in error, cited *Williams on Executors,* 413. 4 *Madd. Ch. Rep.* 44. *Patton* v. *Randall,* (1 *Jac. & Walk.* 189. 195.) *Rugan* v. *Phillips,* (4 *Yeates,* 382.) *Murray* v. *Garretson,* (4 *Serg. & Rawle,* 130.) *Thomson* v. *Dougherty,* (12 *Serg. & Rawle,* 460.) *Bauer* v. *Roth,* (4 *Rawle,* 96.)

Mr. *Keemlé* and Mr. *Scott,* contra, cited *Allison* v. *Wilson,* (13 *Serg. & Rawle,* 330.) *Morrow* v. *Brenizer,* (2 *Rawle,* 187.) *Sugden on Powers,* 175. *Combes's Case,* (9 *Rep.* 75, 6.) *Ingram* v. *Ingram,* (2 *Atk.* 88.) *Cole* v. *Wade,* (16 *Ves.* 27.) *Davoue* v. *Fanning,* (2 *Johns. Ch. Rep.* 252.) *Zebach* v. *Smith,* (3 *Binn.* 69.) *Ragan's Estate,* (7 *Watts,* 442.) *Walton* v. *Willis,* (1 *Dall.* 351.) *Hersha* v. *Brenneman,* (6 *Serg. & Rawle,* 2.) *Allen* v. *Getz,* (2 *Penn. Rep.* 310.) *Macintosh* v. *Barber,* (1 *Bingh.* 50; 8 *Eng. Com. Law Rep.* 242.) *Leisenring* v. *Black,* (5 *Watts,* 304.) *Willis on Trustees,* 163.

The opinion of the Court was delivered by

ROGERS, J.—The exceptions on which the plaintiffs in error rely, are to the charge of the Court in relation to the appraisement of the 10th of March, 1797. The tenor of the charge undoubtedly is, that if the appraisers were in fact appointed by the executor, a valuation made, and the property accepted, the plaintiff had no title. The charge took from the jury, in a certain event, all necessity of inquiring into the validity of the deed of 1813. If the jury, say the Court, adopt this view of the facts, namely, that there was an appointment by the executor of the appraisers, a valuation under it, and an election by Barbara, the present plaintiff has no title. Again, that if there was, by three creditable and judicious men, duly appointed, a valuation, and there was an election by Barbara, the plaintiff cannot recover. And in conclusion they say, that if there was no such valuation, and no such election, the jury will decide upon the transactions of 1813 and subsequent years. The Court instructed the jury, that the husband had the right to appoint the appraisers, and the wife the sole right to elect to take the premises at the valuation; or in other words, that Andrew Geyer had both the right to appoint, and to elect; for the right of election of the wife could only be exercised through the medium of her husband. That the testator had the right to vest this extraordinary power, in the executor, no person can doubt; but before we give the will a construction which vests him with a power affording such temptation to fraud, it is not unreasonable to require plain demonstration in the will of intention, or a necessary or inevitable implication of authority to appoint the appraisers. In England, it is said, that even an act of parliament made against natural equity, as to make a man a judge in his own cause, is void. *Hob.* 87. 12 *Mod.* 2 *Rawle,* 373. To appoint a judge in his own cause is equally against natural justice, and little less objectionable. Here, the power to appoint the appraisers is an implied power; for it

(Boshart v. Evans.)

cannot be pretended that the testator has given the power in express words. It sometimes happens, as is said in *Sug. on Powers*, 133, that a testator directs his estates to be sold for certain purposes, without directing by whom the sale shall be made. In the absence of such a declaration, if the fund be distributable by the executor, he will have the power by implication. But this is only true when the management of the fund is expressly given to the executors. In *Bentham* v. *Wiltshire*, cited in 1 *Jacob & Walk.* 196, the vice chancellor decided, that when the produce was to be divided amongst the children, the absence of any devise did not give the power to the executors. It is therefore not universally true, that when there is no other person authorised to sell, the executors shall. It might then have been doubted whether, in the absence of an express direction to that effect, the executors would have had the power even to sell, much less to exercise the more questionable power to appoint persons to value the premises. To remove all doubts, the act of the 24th of February, 1834, provides, that all powers, authorities and directions relating to real estate, contained in any last will, and not given to any person by name, or by description, shall be deemed to have been given to the executors thereof; but no such power, authority or direction shall be exercised or carried into effect by them, except under the control and direction of the Orphans' Court, having jurisdiction of the accounts. When the testator intends that the executor shall have a power over his real estate, as in the instance to sell, he gives it to them in express terms; and this would seem to negative any implication of power. The natural construction of the will, and particularly under the peculiar circumstances of the case, is to give the power to appoint the appraisers, to the devisees, viz., the three children of the testator, who are equally interested in the valuation.

But in whom is the right of election? The first choice, by the will, is given to Andrew; and Andrew having died, by a codicil the testator devises all the legacies and estate intended for his son, unto his three children, Catharine, George and John—in other words, he places them precisely in the situation of the deceased parent. The language of the will is very general, and is sufficiently comprehensive to embrace the right of election; and the construction would seem to be necessary to carry into effect the general intention, which manifestly was, to keep the homestead in the family; preferring, which is very natural, the male branch, as represented by the children of his deceased son Andrew. But it is said, that the election could not be made by the guardian of the children, and as a consequence, that none could be made until the youngest child came of age. Granting this, which is by no means clear, yet this is no reason for depriving the children of a valuable right. In *Patten* v. *Randall*, (1 *Jac. & Walk.* 197,) it is said, if a testator will give property to minors, and order a sale of it, that cannot authorise the Court to substitute by implication, executors or trustees in their place, and to

(Boshart *v.* Evans.)

take away the power of sale from one, and give it to the other. So also, in the same case, it is decided that a power of sale not expressly given to any one, is not implied to the executor, because the devisees of the estate are minors. The opinion of the Court not only deprives the children of the first choice, but of any choice or election whatever; a construction which necessarily defeats the testator's general intention, which was to retain, if practicable, the estate in the family. If they have any right of choice, no reason can be given why that right should be postponed in favour of Barbara, who in the will had the second choice. No such intention is indicated in any part of the will.

We are also of the opinion, that the power of appointment, and the election, were not duly executed. For whenever a power is given in relation to the transfer of real estate, the power must be executed in writing. The guardianship accounts were material, and in that aspect only, as indicative of fraud and imposition upon the children.

But it is said, the only interest of the devisees is money, not land, and that ejectment is not the proper remedy: that where land is directed to be converted into money, or money into land, it is to be treated as that species of property into which the one or the other is directed to be converted. But the direction to sell is contingent, and not absolute; and until the contingency happens, the executors have no control over the estate, nor any interest whatever in it. Until the appraisement, and refusal to take the premises, after the death of the widow, the legal estate descends to the heirs-at-law, of whom the plaintiff was one, or to them as devisees; and in either case he can sustain an ejectment, if otherwise entitled to the possession.

Judgment reversed, and a *venire de novo* awarded.